**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

WILLIAM MEYERS, SR.,
Individually; as the next friend of
and Personal Representative of the
Estate of Ryan Meyers; ANNA
MAE MEYERS, Individually; as the
next friend of and Personal
Representative of the Estate of
Ryan Meyers,

*Plaintiffs-Appellants,*

v.

BALTIMORE COUNTY, MARYLAND;
STEPHEN MEE, Police Officer,
Baltimore County Police
Department in both his official
and individual capacities; VINCENT
ROMEO, Police Officer, Baltimore
County Police Department in both
his official and individual
capacities; KAREN GAEDKE, Police
Officer, Baltimore County Police
Department in both her official
and individual capacities,

*Defendants-Appellees,*

and

ALLISON PALADINO,

*Defendant.*

No. 11-2192

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Benson Everett Legg, District Judge.
(1:10-cv-00549-BEL)

Argued: December 5, 2012

Decided: February 1, 2013

Before SHEDD, KEENAN, and WYNN, Circuit Judges.

---

Affirmed in part, reversed in part, and remanded by published opinion. Judge Keenan wrote the opinion, in which Judge Shedd and Judge Wynn joined.

---

**COUNSEL**

**ARGUED:** Gregory L. Lattimer, LAW OFFICES OF GREGORY L. LATTIMER, Washington, D.C., for Appellants. Paul M. Mayhew, BALTIMORE COUNTY OFFICE OF LAW, Towson, Maryland, for Appellees. **ON BRIEF:** Ted J. Williams, Washington, D.C., for Appellants. Michael E. Field, County Attorney, BALTIMORE COUNTY OFFICE OF LAW, Towson, Maryland, for Appellees.

---

**OPINION**

BARBARA MILANO KEENAN, Circuit Judge:

   In this appeal, we consider the district court's summary judgment holding that certain officers of the Baltimore County Police Department were entitled to qualified immunity. The conduct at issue involved the officers' entry into the

residence of Ryan Meyers (Ryan) in responding to a report of domestic violence involving Ryan and members of his family. While attempting to arrest Ryan, one of the officers directed his conducted energy device, commonly known as a "taser," at Ryan ten times, leading to Ryan's death.

Ryan's parents, William Meyers, Sr. (Mr. Meyers) and Anna Mae Meyers (Mrs. Meyers) (collectively, the plaintiffs), filed an amended complaint (the complaint) in the district court, alleging under 42 U.S.C. § 1983 that the officers' actions leading to Ryan's death violated his Fourth Amendment rights. The plaintiffs also alleged in their complaint that the officers' conduct violated certain provisions of Maryland state law. The district court held that all three officers involved in the incident were entitled to qualified immunity and awarded summary judgment in their favor. *Meyers v. Baltimore Cnty., Md.*, 814 F. Supp. 2d 552 (D. Md. 2011).

Upon our review, we hold that the district court did not err in concluding that two of the officers were entitled to qualified immunity, but that the court erred in awarding summary judgment in favor of the officer who repeatedly activated his taser at Ryan. We reach this conclusion based on our holding that: (1) the one officer's use of the taser was not objectively reasonable after Ryan ceased actively resisting arrest; and (2) a reasonable person in the officer's position would have known that the use of a taser in such circumstances violated clearly established constitutional rights. Accordingly, we affirm in part, and reverse in part, the district court's award of summary judgment.

## I.

### A.

We review the facts in the light most favorable to the plaintiffs, the non-moving party in the district court. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S.

574, 587-88 (1986); *Henry v. Purnell*, 652 F.3d 524, 527 (4th Cir. 2011) (en banc). The following facts are taken from the record, including the complaint and the deposition testimony of Ryan's family members and the police officers who were present during the events at issue.

Ryan Meyers was forty years old at the time of his death. He had been diagnosed with bipolar disorder at the age of fifteen, and struggled with this mental illness throughout his adulthood. He "dropped out" of school after the ninth grade, and lived with his parents his entire life. Prior to the events at issue, the Meyers family had contacted law enforcement authorities on five occasions to have Ryan forcibly detained and transported to a mental health facility for psychiatric evaluation, including three times during the previous ten years.

On the evening of March 16, 2007, Mrs. Meyers placed a telephone call to a "911 operator" to report that Ryan and his brother, William Meyers, Jr. (Billy), were engaged in a fight. When the 911 operator attempted to obtain additional information from Mrs. Meyers, she did not respond. However, the 911 operator heard "screaming in [the] background." Based on this telephone call, officers from the Baltimore County Police Department (the Department) were dispatched to the Meyers' residence (the residence).

Officer Vincent Romeo was the first officer to arrive at the residence, where he found Mr. Meyers and Billy in the front yard. Mr. Meyers was holding a towel against his face to cover a laceration on his nose, which also was swollen. Mr. Meyers informed Officer Romeo that Ryan was inside the home, and that Mrs. Meyers had fled and would not return until the police had removed Ryan from the premises. From his vantage point on the porch of the residence, Officer Romeo could see that Ryan was pacing inside the house carrying a baseball bat.

Before attempting to enter the residence, Officer Romeo spoke with Billy about the events that had occurred. Billy

stated that when he arrived at the house that evening, he heard his mother exclaim, "Stop, Ryan. You are hurting me." Billy responded by punching Ryan, and a fistfight ensued, causing Mrs. Meyers to contact the police. Billy also told Officer Romeo that Ryan "has problems upstairs and he's bipolar."

Officer Karen Gaedke later arrived at the residence in response to Officer Romeo's request for additional assistance. Officer Gaedke was familiar with Ryan's mental illness, having recently arrested him due to an incident at a nearby convenience store. After Officer Gaedke arrived at the residence, she and Officer Romeo began speaking with Ryan to convince him to surrender peacefully, but he rebuffed their efforts, stating, "No, you're going to kill me."

Officer Romeo concluded that Ryan would not voluntarily leave the residence, that he was in an "agitated state," and that he posed a threat to the officers' safety because he was carrying a baseball bat. Accordingly, Officer Romeo contacted a police dispatcher, asking that an officer trained to use a taser be sent to the residence.

Officer Stephen Mee, who was authorized by the Department to use a taser,[1] responded to Officer Romeo's request. Upon arriving at the residence, Officer Mee unsuccessfully engaged in a dialogue with Ryan in an attempt to have him surrender voluntarily. Thereafter, Officer Mee, Officer Romeo, Officer Gaedke, and Officer Andrew Callahan, IV, who also had responded to the scene, (collectively, the officers) gained access to the home by using a key provided by Billy. Billy entered the home at the same time and was a witness to the events described below.[2]

---

[1] The Department authorized the use of tasers in 2006, but only a few officers at each police precinct are allowed to carry and use a taser.

[2] The officers dispute Billy's recollection that he entered the home contemporaneously with the officers.

Upon entry, Officer Mee ordered Ryan to drop the baseball bat. According to Billy, Officer Mee deployed his taser almost immediately after ordering Ryan to drop the bat, without giving Ryan time to comply with the officer's command. However, it is undisputed that Ryan was holding the bat when he first was struck by the taser's probe, and that Ryan may have taken a step toward the officers immediately before the probe made contact with his body.

During Officer Mee's first three deployments of the taser, the device was in "probe mode," during which two probes attached to thin electrical wires were fired from the taser, causing an electric shock to be delivered to Ryan upon contact.[3] The first taser probe fired by Officer Mee struck Ryan on his upper body, registering a shock of about 60,000 volts that lasted five seconds. Ryan, who was about six feet in height and weighed about 260 pounds, did not drop his bat or fall to the floor in response to the first taser shock. Officer Mee stated that, after the first taser shock, Ryan was still holding the baseball bat and took two more steps toward the officers. According to Billy, however, Ryan went into convulsions and exclaimed, "I give up. I give up. Stop. Stop. I give up."

Officer Mee again directed his taser in probe mode at Ryan, resulting in an additional 60,000-volt shock that lasted five seconds. This second taser shock caused Ryan to drop his bat,

---

[3]As described by the district court, "[a] [t]aser can be used either in 'probe' mode or in 'stun' mode. In probe mode, two probes are fired from a distance, attached to thin electrical wires, to lodge in the skin of the subject. The [t]aser then delivers a fixed five-second cycle of electricity designed to cause electro-muscular disruption, effectively freezing the subject's muscles and thereby temporarily disabling him. In stun mode, the probe cartridge is removed and the [t]aser's electrodes are applied directly to the subject. The [t]aser operator can then deliver a painful electric shock, the duration of which is completely within [the operator's] control. In stun mode, the [t]aser does not cause muscular disruption or incapacitation, but rather functions only as a 'pain compliance' tool." 814 F. Supp. 2d at 555 n.3.

but he remained standing and again advanced toward the officers. Officer Mee directed his taser at Ryan a third time, delivering another 60,000-volt shock that lasted five seconds and caused Ryan to fall to the ground.

After Ryan fell, Officer Mee, Officer Callahan, and one other officer sat on Ryan's back. While the other officers remained seated on Ryan's back, Officer Mee fired his taser a fourth time in probe mode.[4] Officer Mee thereafter changed the taser's mode from "probe mode" to "stun mode" and, during a period slightly exceeding one minute, delivered six additional taser shocks to Ryan, which each lasted between two and four seconds.[5]

After Officer Mee's tenth use of the taser on Ryan, the officers observed that Ryan appeared to be unconscious. Thereafter, an ambulance, which had been requested after Officer Mee first used the taser, arrived at the residence. The responding paramedics found Ryan in a state of cardiac arrest, and they were unable to revive him.

The parties gave conflicting accounts regarding Ryan's actions during Officer Mee's use of his taser for the fourth

---

[4]Officer Mee stated during his deposition that the fourth "probe mode" use of the taser did not make sufficient contact with Ryan to deliver the 60,000-volt shock.

[5]As confirmed by the taser's internal computer records, Officer Mee used his taser on Ryan as follows:

| #  | Mode  | Duration | Time elapsed from end of prior use |
|----|-------|----------|------------------------------------|
| 1  | Probe | 5 sec.   | –                                  |
| 2  | Probe | 5 sec.   | 1 sec.                             |
| 3  | Probe | 5 sec.   | 1 sec.                             |
| 4  | Probe | 5 sec.   | 86 sec.                            |
| 5  | Stun  | 4 sec.   | 2 sec.                             |
| 6  | Stun  | 2 sec.   | 1 sec.                             |
| 7  | Stun  | 2 sec.   | 4 sec.                             |
| 8  | Stun  | 3 sec.   | 13 sec.                            |
| 9  | Stun  | 2 sec.   | 2 sec.                             |
| 10 | Stun  | 2 sec.   | 38 sec.                            |

through the tenth times (the seven additional taser shocks). According to some of the officers, Ryan was actively resisting the officers' efforts to place him in handcuffs. These officers testified that Ryan was able to regain control of the baseball bat while he was on the ground, and tried to bite the officers when he again lost control of the bat. These officers further testified that Ryan stated loudly during the struggle, "I want to die, I want to die," and "[j]ust kill me cause I'm going to kill you."

Officer Gaedke, however, provided a different version of the events that occurred after Ryan fell to the floor. She testified in her deposition that after Ryan fell, officers were sitting on Ryan's "[u]pper body, lower body, [and] middle body." She further stated that during this time, instead of screaming at the officers and attempting to bite them, Ryan said nothing and was "[s]tiffening up and keeping his body rigid and keeping his hands underneath of his body."

Billy's testimony concerning the extent of Ryan's resistance also conflicted with the testimony provided by the male officers. Billy testified that after Ryan fell to the floor, he merely tried to move his legs while the officers sat on his back.

## B.

In the complaint filed against Baltimore County and Officers Mee, Romeo, and Gaedke (collectively, the defendants), the plaintiffs raised a claim under 42 U.S.C. § 1983 alleging excessive force in violation of the Fourth Amendment, as well as several claims under Maryland law.[6] The district court entered an order bifurcating the case, reserving litigation of

---

[6]The Maryland claims included causes of action under the Maryland Survival Act, the Maryland Wrongful Death Act, Articles 24 and 26 of the Constitution of Maryland, and the common law torts of negligence, gross negligence, and negligent training and supervision.

the claims against Baltimore County until after the claims concerning the officers' liability were resolved.

The defendants filed a motion for summary judgment, contending that the officers were immune from suit under the doctrine of qualified immunity. In granting the defendants' motion, the district court concluded: (1) that the officers' warrantless entry into the residence and their initial seizure of Ryan were objectively reasonable because those actions were supported by probable cause; (2) that Officer Mee's first three uses of his taser, during the period in which Ryan remained standing, were objectively reasonable and did not constitute the use of excessive force; and (3) that the evidence did not support the need for delivering the seven additional taser shocks, but that those acts did not violate clearly established law.[7] The plaintiffs timely filed a notice of appeal.

## II.

### A.

We review de novo the district court's award of summary

---

[7]In conducting its analysis, the district court did not consider separately the plaintiffs' federal and state law claims, stating that "[e]ach of the [p]laintiffs' claims rests on the existence of a single underlying wrong, the use of excessive force to effect a seizure in violation of [Ryan's] Fourth Amendment rights." 814 F. Supp. 2d at 557. The plaintiffs do not argue on appeal that the district court erred in construing their complaint in this manner or in conducting a single analysis of their federal and state law claims. Accordingly, our analysis focuses solely on whether the officers' conduct violated Ryan's Fourth Amendment rights. To the extent that the doctrine of qualified immunity does not shield a state official from liability for alleged violations of the Constitution of Maryland, *see Okwa v. Harper*, 757 A.2d 118, 140 (Md. 2000), or that any of the claims arising under Maryland law require a different analysis than the plaintiffs' Section 1983 claim, those issues have not been raised by the plaintiffs, and, accordingly, are waived for purposes of this appeal. *See United States v. Hudson*, 673 F.3d 263, 268 (4th Cir. 2012) (issues not raised in opening brief are waived).

judgment. *See Durham v. Horner*, 690 F.3d 183, 188 (4th Cir. 2012). Summary judgment is appropriate only when there is no genuine dispute regarding any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 295 (4th Cir. 2010).

As stated above, we view the facts, and all reasonable inferences that may be drawn from those facts, in the light most favorable to the non-moving party. *See Matsushita*, 475 U.S. at 587-88; *Henry*, 652 F.3d at 527. Thus, on appeal from an award of qualified immunity, we generally "adopt[ ] . . . the plaintiff's version of the facts." *Witt v. W. Va. State Police, Troop 2*, 633 F.3d 272, 276 (4th Cir. 2011) (citing *Scott v. Harris*, 550 U.S. 372, 378 (2007)).

In conducting this review, "[i]t is not our job to weigh the evidence." *Gray v. Spillman*, 925 F.2d 90, 95 (4th Cir. 1991). Accordingly, disputed questions of fact must be resolved in favor of the non-moving party at the summary judgment stage. *See Davis v. Zahradnick*, 600 F.2d 458, 460 (4th Cir. 1979) (holding that summary judgment is not appropriate if the resolution of material issues depends upon credibility determinations); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment"); *Ray Commc'ns, Inc. v. Clear Channel Commc'ns, Inc.*, 673 F.3d 294, 305 (4th Cir. 2012) (credibility determinations are not part of summary judgment proceedings).

B.

The doctrine of qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield

officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The doctrine shields government officials from liability for civil damages, provided that their conduct does not violate clearly established statutory or constitutional rights within the knowledge of a reasonable person. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Because qualified immunity is an immunity from suit rather than merely a defense to liability, such immunity effectively is lost if a court erroneously permits a case to proceed to trial. *Pearson*, 555 U.S. at 231 (citation omitted). The burden of proof and persuasion with respect to a defense of qualified immunity rests on the official asserting that defense. *Wilson v. Kittoe*, 337 F.3d 392, 397 (4th Cir. 2003).

Our application of the qualified immunity doctrine is governed by the analysis set forth by the Supreme Court in *Saucier v. Katz*, 533 U.S. 194 (2001), as modified by the Court's later decision in *Pearson*. The Court's holding in *Saucier* requires a two-step approach, under which a court first must decide whether the facts alleged or shown, taken in the light most favorable to the plaintiff, establish that the police officer's actions violated a constitutional right. 533 U.S. at 201. When a plaintiff has satisfied this initial step, a court next must determine whether the right at issue was "clearly established" at the time of the officer's conduct. *Id.*; *see also Pearson*, 555 U.S. at 236 (modifying the *Saucier* approach such that lower courts are no longer required to conduct the analysis in the sequence set forth in *Saucier*).[8] Thus, although a plaintiff may prove that an officer has violated certain constitutional rights, the officer nonetheless is entitled to qualified

---

[8]Here, we exercise our discretion to analyze the two prongs of the qualified immunity analysis in the order originally provided by the Court in *Saucier*. *See Pearson*, 555 U.S. at 236 ("The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").

immunity if a reasonable person in the officer's position "could have failed to appreciate that his conduct would violate those rights." *Torchinsky v. Siwinski*, 942 F.2d 257, 261 (4th Cir. 1991) (citation and internal quotation marks omitted).

C.

1.

We first consider the plaintiffs' argument that the officers are not entitled to qualified immunity because their initial seizure of Ryan was not supported by probable cause and, thus, was unlawful. The district court rejected the plaintiffs' argument, holding that the officers had ample reason to conclude that Ryan had assaulted one or more members of his family. We agree with the district court's determination.

Police officers may arrest an individual in the absence of a warrant when the totality of the circumstances establishes probable cause that the individual has committed a felony. *Park v. Shiflett*, 250 F.3d 843, 850 (4th Cir. 2001) (citing *Illinois v. Gates*, 462 U.S. 213, 230–31 (1983)). Under Maryland law, a police officer also may arrest an individual without a warrant when there is probable cause that the individual has assaulted a person with whom he resides, irrespective whether the assaultive behavior constitutes a misdemeanor or a felony. *See* Md. Code Ann. Crim. Proc. § 2-204 (domestic assault).

As the Supreme Court recognized in *Gates*, "probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." 462 U.S. at 232. In the present case, the facts established that when the officers arrived at the residence, they knew that there had been an altercation involving Ryan and three family members. The officers also were aware from the 911 telephone call that Ryan's mother had reported an ongoing fight between her sons, and that there had been screaming heard on the line dur-

ing the call. Additionally, the officers knew that Mr. Meyers had sustained a laceration on his face, that Mrs. Meyers had fled the home, and that Ryan was inside the home pacing with a baseball bat.

Under the totality of these circumstances, the officers had probable cause to arrest Ryan for domestic assault under Maryland law. *See* Md. Code Ann. Crim. Proc. § 2-204. As provided by the Maryland domestic assault statute, police may make an arrest without a warrant, irrespective whether the crime is a misdemeanor or a felony, when there is proba-ble cause that: (1) the individual assaulted a person with whom he resides; (2) there is evidence of physical injury; and (3) the individual may cause additional injury or property damage. *Id.*; *see also Torres v. State*, 807 A.2d 780, 782 n.3 (Md. Ct. Spec. App. 2002) (discussing domestic assault as a misdemeanor crime for which a police officer may make a warrantless arrest). Here, the officers had probable cause to believe that Ryan had assaulted at least one of his parents with whom he resided, that Mr. Meyers had sustained a facial laceration as a result of being assaulted by Ryan, and that Ryan, armed with a baseball bat, could cause additional phys-ical injury or property damage.

We disagree with the plaintiffs' contention that it was unreasonable for the officers to enter the home and seize Ryan, rather than to request the assistance of the Depart-ment's Mobile Crisis Team (MCT), which often responds to ongoing events involving mentally ill individuals. Among other reasons, this argument fails because it is undisputed that under Department policy, the MCT is not permitted to respond to situations involving "[d]omestic violence with a weapon" or "active violence," circumstances that were present when the officers decided to enter the residence to arrest Ryan.

Accordingly, we conclude that the officers' entry into the residence to arrest Ryan, with the key provided by Billy, did

not violate Ryan's Fourth Amendment rights. Because Officer Romeo and Officer Gaedke were not responsible for the manner in which Officer Mee used his taser, we conclude that the district court did not err in holding that Officer Romeo and Officer Gaedke are entitled to qualified immunity.

2.

We next consider the plaintiffs' argument that Officer Mee's first three uses of his taser constituted unreasonable and excessive force, in violation of the Fourth Amendment. In relevant part, the Fourth Amendment prohibits police officers from using force that is "excessive" or not "reasonable" in the course of making an arrest. *Graham v. Connor*, 490 U.S. 386, 395 (1989). We determine whether an officer has used excessive force to effect an arrest based on a standard of "objective reasonableness," taking into account "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396, 399.

We conclude that Officer Mee's first three deployments of his taser did not amount to an unreasonable or excessive use of force. During the period that Officer Mee administered the first three taser shocks, Ryan was acting erratically, was holding a baseball bat that he did not relinquish until after he received the second shock, and was advancing toward the officers until the third shock caused him to fall to the ground. Under these circumstances, Ryan posed an immediate threat to the officers' safety, and was actively resisting arrest. *See id.* As aptly stated by the district court, "Officer Mee was faced with the task of subduing an armed, agitated, physically imposing suspect in the confined space of a living room without risking his own safety or that of his fellow officers." 814 F. Supp. 2d at 559. Accordingly, we conclude that Officer Mee's first three uses of the taser were objectively reasonable and did not violate Ryan's Fourth Amendment rights.

### 3.

### a.

We next address the plaintiffs' argument that Officer Mee is not entitled to qualified immunity because his further use of the taser, administering the seven additional taser shocks, was not objectively reasonable and violated Ryan's clearly established constitutional rights. We emphasize that our analysis is based on the plaintiffs' version of the facts as drawn primarily from the depositions of Ryan's family members, including Billy who stated that he was inside the residence and directly observed Officer Mee's conduct. Although a jury ultimately may find that the officers' version of the events is more credible, we are not permitted to make such credibility determinations when considering whether a police officer properly was held immune from suit under the doctrine of qualified immunity. *See Anderson*, 477 U.S. at 255; *Ray Commc'ns*, 673 F.3d at 305.

Our conclusion that Officer Mee's first three uses of the taser were objectively reasonable does not resolve our inquiry into the reasonableness of the seven additional taser shocks that he administered, because "force justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated." *Waterman v. Batton*, 393 F.3d 471, 481 (4th Cir. 2005). Here, the evidence showed that the justification for Officer Mee's first three uses of his taser had been eliminated after Ryan relinquished the baseball bat and fell to the floor. At that point, several officers sat on Ryan's back, and Ryan only was able to move his legs. Moreover, according to Officer Gaedke, Ryan was silent and "stiffened" his body, keeping it rigid while he was on the ground. Therefore, the above testimony from Billy and Officer Gaedke indicated that, after Ryan fell to the floor, he no longer was actively resisting arrest, and did not pose a continuing threat to the officers' safety. *Cf. Gra-*

*ham*, 490 U.S. at 396. Nevertheless, Officer Mee continued to use his taser until he had rendered Ryan unconscious.

The district court recognized that Officer Mee's actions implementing the seven additional taser shocks were inappropriate, concluding that "the Court cannot say as a matter of law that Officer Mee's actions were objectively reasonable." 814 F. Supp. 2d at 560. We agree but state the conclusion affirmatively: It is an excessive and unreasonable use of force for a police officer repeatedly to administer electrical shocks with a taser on an individual who no longer is armed, has been brought to the ground, has been restrained physically by several other officers, and no longer is actively resisting arrest. Because the plaintiffs' evidence supports the inference that such conduct occurred here, the plaintiffs have satisfied their initial burden at the summary judgment stage of demonstrating that Ryan's Fourth Amendment rights were violated.

b.

The second step of the qualified immunity analysis requires us to consider whether Officer Mee's objectively unreasonable conduct violated a constitutional right that was clearly established at the time the conduct occurred. *Saucier*, 533 U.S. at 201. Despite his violation of Ryan's constitutional rights, Officer Mee would be entitled to qualified immunity "if a reasonable person in [Officer Mee's] position could have failed to appreciate that his conduct would violate [Ryan's] rights." *Torchinsky*, 942 F.2d at 261 (citation and internal quotation marks omitted).

The district court held that Officer Mee's actions did not violate a clearly established constitutional right. The court concluded that there was an absence of precedent "offering guidance as to the point at which continued tasings become excessive when the suspect is *actively resisting*." 814 F. Supp. 2d at 561 (emphasis added). We disagree with the district court's conclusion, which was based on a false premise.

Viewing the facts in the light most favorable to the plaintiffs, the evidence did not show that Ryan was actively resisting arrest at the time the seven additional taser shocks were administered. Instead, as stated above, the evidence showed that after Officer Mee's third use of the taser, Ryan fell to the floor and did not continue to resist arrest actively at that time.

We repeatedly have held that it is not required that a right violated already have been recognized by a court in a specific context before such right may be held "clearly established" for purposes of qualified immunity. *See Buonocore v. Harris*, 65 F.3d 347, 356–57 (4th Cir. 1995); *Pritchett v. Alford*, 973 F.2d 307, 314 (4th Cir. 1992); *see also Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (rejecting proposition that qualified immunity is inapplicable only if the very action in question has previously been held unlawful); *Robles v. Prince George's Cnty.*, 302 F.3d 262, 270 (4th Cir. 2002) (same); *Wilson v. Layne*, 141 F.3d 111, 114 (4th Cir. 1998) (en banc) (same). Thus, the absence of a judicial decision holding that it is unlawful to use a taser repeatedly and unnecessarily under similar circumstances does not prevent a court from denying a qualified immunity defense. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 251 (4th Cir. 1999); *Kittoe*, 337 F.3d at 403. As the Supreme Court has emphasized, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope*, 536 U.S. at 741.

We also have stated in forthright terms that "officers using unnecessary, gratuitous, and disproportionate force to seize a secured, unarmed citizen, do not act in an objectively reasonable manner and, thus, are not entitled to qualified immunity." *Bailey v. Kennedy*, 349 F.3d 731, 744-45 (4th Cir. 2003) (quoting *Jones v. Buchanan*, 325 F.3d 520, 531-32 (4th Cir. 2003)). The fact that the force used in the present case emanated from a taser, rather than from a more traditional device, is not dispositive. The use of any "unnecessary, gratuitous, and disproportionate force," whether arising from a gun, a

baton, a taser, or other weapon, precludes an officer from receiving qualified immunity if the subject is unarmed and secured. *See Park*, 250 F.3d at 852-53 (concluding that an officer's use of "pepper spray" to subdue an unarmed subject was irresponsible and excessive when the subject was not a threat to the officer or the public, and that the officer was not entitled to qualified immunity); *see also Orem v. Rephann*, 523 F.3d 442, 449 (4th Cir. 2008) (concluding that use of a taser to "punish or intimidate" a pretrial detainee is not objectively reasonable and is contrary to clearly established law).

Here, Ryan was unarmed and effectively was secured with several officers sitting on his back. In such circumstances, the seven additional taser shocks administered by Officer Mee were clearly "unnecessary, gratuitous, and disproportionate." *See Bailey*, 349 F.3d at 744-45. Thus, based on the present record, because Ryan did not pose a threat to the officers' safety and was not actively resisting arrest, a reasonable officer in Officer Mee's position would have understood that his delivery of some, if not all, of the seven additional taser shocks violated Ryan's Fourth Amendment right to be free from the use of excessive and unreasonable force. Accordingly, we hold that the district court erred in concluding that Officer Mee met his burden of proving that he was entitled to qualified immunity.

### III.

For these reasons, we affirm the district court's judgment granting qualified immunity to Officer Romeo and Officer Gaedke, but reverse the district court's judgment granting qualified immunity to Officer Mee. We remand this matter to the district court for further proceedings consistent with this opinion.[9]

---

[9]We do not address the extent to which Baltimore County may remain subject to trial for the events leading to Ryan's death. We leave for the district court's determination whether any claims asserted against the County should be dismissed in light of our holding.

*AFFIRMED IN PART,*
*REVERSED IN PART,*
*AND REMANDED*