**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 18-2142

ESTATE OF WAYNE A. JONES BY ROBERT L. JONES AND BRUCE A.
JONES, Administrators of the Estate of Wayne A. Jones,

Plaintiff - Appellant,

v.

THE CITY OF MARTINSBURG, WEST VIRGINIA; PFC. ERIK HERB; PFC.
DANIEL NORTH; PTLM. WILLIAM STAUBS; PTLM. PAUL LEHMAN; PFC.
ERIC NEELY,

Defendants - Appellees.

Appeal from the United States District Court for the Northern District of West Virginia, at
Martinsburg.  Gina M. Groh, Chief District Judge.  (3:13-cv-00068-GMG-RWT)

Submitted:  March 26, 2020                          Decided:  June 9, 2020
                        Amended:  June 10, 2020

Before GREGORY, Chief Judge, and FLOYD and THACKER, Circuit Judges.

Affirmed in part, vacated in part, and remanded by published opinion.  Judge Floyd wrote
the opinion in which Chief Judge Gregory and Judge Thacker joined.

Christopher E. Brown, THE BROWN FIRM PLLC, Alexandria, Virginia, for Appellant.
Philip W. Savrin, FREEMAN MATHIS & GARY, LLP, Atlanta, Georgia, for Appellees.

FLOYD, Circuit Judge:

In 2013, Wayne Jones, a black man experiencing homelessness, was stopped by law enforcement in Martinsburg, West Virginia for walking alongside, rather than on, the sidewalk. By the end of this encounter, Jones would be dead. Armed only with a knife tucked into his sleeve, he was tased four times, hit in the brachial plexus, kicked, and placed in a choke hold. In his final moments, he lay on the ground between a stone wall and a wall of five police officers, who collectively fired 22 bullets. Jones's Estate sued under 42 U.S.C. § 1983, bringing a Fourth Amendment claim against the officers and a *Monell* claim against the City of Martinsburg. In protracted litigation, the Estate has been kicked out of district court three times. Most recently, the district court granted summary judgment to the defendants on both claims, holding that the officers are protected by qualified immunity and that the City cannot be liable under a *Monell* theory for failing to train those officers. Although we agree that the City is insulated from *Monell* liability premised on one incident of excessive force, we reverse the grant of summary judgment to the officers on qualified immunity grounds, as a reasonable jury could find that Jones was both secured and incapacitated in the final moments before his death.

I.

In reviewing the district court's grant of summary judgment, we state the facts in the light most favorable to the Estate. *See Yates v. Terry*, 817 F.3d 877, 881 (4th Cir. 2016). Having previously done so, we largely reiterate our description of the facts in *Estate of*

2

*Jones v. City of Martinsburg*, 726 F. App'x 173, 174–75 (4th Cir. 2018), with a few elaborations when relevant to our qualified immunity analysis.

Around 11:30 p.m. on March 13, 2013, Officer Paul Lehman of the Martinsburg Police Department (MPD) was on patrol when he spotted Jones walking in the road, instead of on the sidewalk, near downtown Martinsburg, West Virginia. A state law and a city ordinance both require that pedestrians use sidewalks when available. *See* W. Va. Code § 17C-10-6(a); Martinsburg, W. Va. Ordinance § 371.06(a). Jones was a 50-year-old black man and weighed 162 pounds. He was experiencing homelessness and had been diagnosed with schizophrenia.

Lehman followed Jones in his marked police car for one minute. Lehman then parked his car near Jones, exited the vehicle, and asked Jones why he was walking in the street. Lehman asked Jones for identification; Jones replied that he did not have any identification. Lehman then asked to search him for weapons. Jones first asked, "What's a weapon?" When Lehman explained that this meant "anything—guns, knives, clubs," Jones acknowledged that he did have "something."

The encounter quickly escalated. Lehman called the MPD for backup and began to demand that Jones put his hands on the police car. Jones did not comply and instead tried to move away from Lehman. Lehman began to repeatedly shout, "Put your hands on the car." Jones responded, "What are you trying to do?"; "What do you want?"; and "What did I do to you?" Lehman never answered Jones's questions. Lehman then pulled out his taser and discharged it on Jones. Officer Daniel North reached the scene at approximately the same time that Lehman was discharging his taser. North tased Jones as well. The

3

officers reported that the tasers appeared to have no effect on Jones. According to Lehman, Jones then "hit" Lehman in the face in such a way that his toboggan was pulled over his eyes.

Jones broke away and ran down the street. North pursued him on foot and was the first officer to catch up with him. According to North, Jones's hands were "about to go up," and he "took that as [Jones] may try to assault him." Unless he was clairvoyant, North could not have known that Jones's hands were "about" to be raised. North then "struck [Jones] in the brachial."

Officer William Staub arrived at the scene and ran toward Jones and North. Jones had "cornered himself" in "a stoop entranceway to a bookstore, up a couple steps." North stated that he told Jones to "just get on the ground, just listen to what we're saying," to which Jones replied: "I didn't do anything wrong." Staub said that "North had his taser out but he wasn't doing nothing" when Staub approached. Jones then moved his hands up. The night of the incident, Staub said that "the guy kind of put his hands up like 'alright' [resigned tone], so me and North both kind of grabbed his hands." Staub and North grabbed Jones, and the three tumbled down the stairs such that North was thrown away from Staub and Jones. Staub "chipped" a bone in his thumb during the fall. Staub wrestled Jones to the ground and put him in "a choke hold, just to kind of stop him from resisting." A loud choking or gurgling sound, which seems to be coming from Jones, is audible on Staub's audio recorder at this time.

Lehman rejoined the group, and Officers Eric Neely and Erik Herb arrived, bringing the number of MPD officers on the scene to five. Jones was on the ground with his feet

4

facing down, moving in a swimmer's kick-like motion. One officer can be heard loudly calling Jones a "motherf\*\*ker." At least one officer can be seen kicking Jones as he lay on the ground. Officer Neely tased Jones for a third time, and North then applied "a drive stun without any probes." The officers reported that these efforts to stun Jones had no visible effect.

Staub was on his knees on the ground and still had Jones in a choke hold when he felt "like a scratch on my hand," which he initially "didn't think much of" because they "were rolling around on the concrete." Then, "a second or two later," at approximately the same time that Officer Neely tased Jones, Staub felt "a sharp poke in [his] side," which "alarmed" him. Staub reported that he then "saw the subject's right hand with a fixed blade knife in his hand" and shouted, "He's got a knife! He's got a knife!" Neely also reportedly saw "a weapon in [Jones's] right hand." At least one officer called to "Get back, get back!"

Having learned of the knife, the officers simultaneously drew back approximately five feet. As they moved back, Jones's left arm dropped lifelessly. Jones was motionless on the ground, laying "with his right side on the ground" and his "right elbow . . . on the ground." All five officers drew their firearms and formed a semi-circle around the recumbent Jones, who was between the officers and the bookstore wall. The officers ordered Jones to drop the weapon. Jones remained motionless and did not verbally respond. Lehman reported that Jones "did not make any overt acts with the knife towards the officers." On the night of the incident, Staub similarly reported that as the officers stepped back, Jones "still had the f\*\*king knife in his hand and he wasn't f\*\*king doing nothing." Seconds later, the five officers fired a total of 22 rounds at Jones, causing 23

5

wounds, and killing him where he lay on the sidewalk. Neely fired the first shot, but the next rounds immediately followed. Most of the bullets entered Jones's back and buttocks. Jones died shortly before midnight.

In the immediate aftermath on the scene, one or two of the shooting officers called for emergency medical services, but none of them rendered aid themselves. When searching Jones's lifeless body, officers found a small fixed blade knife tucked into his right sleeve. After being told that state police were coming to investigate, officers can be heard saying that the incident would be a "cluster" and that they were going to "have to gather some f**king story."

At the time of the shooting, MPD's aggression response policy was to "meet your aggression with the suspect's aggression." J.A. 141. Under that policy, incidents of physical force must be necessary, objectively reasonable, and proportionate. J.A. 142. MPD did not have any program or policy pertaining to interactions with people with mental illness. According to the deposition testimony of Chief of Police Kevin Miller, he decided to conduct such a training after the shooting.

One month after Jones's death, his Estate sued the City of Martinsburg and then-unknown police officers in federal court. The amended complaint alleged three § 1983 claims: (1) that the five named officers used excessive force in violation of the Fourth Amendment; (2) that the officers violated the Fourteenth Amendment by killing Jones, thereby wrongfully depriving his family of a familial relationship with him; and (3) that the City of Martinsburg was liable under a variety of *Monell* theories, including failure to train and failure to discipline the police officers. *See Monell v. Dep't of Soc. Servs.*, 436

6

U.S. 658 (1978).

We now hear the third appeal in this case. The first two appeals pertained to dismissals based on inadvertent admissions by the Estate during discovery. The defendants had sent a Request for Admissions, to which the Estate responded two days late. At first, the district court deemed the facts admitted and granted the defendants' motion for summary judgment. The Estate appealed, arguing that although it had not moved to withdraw the admissions, its late response was a constructive motion under Federal Rule of Civil Procedure 36(b). This Court remanded the case "for consideration of the discretionary factors in Rule 36(b) in determining whether to allow the withdrawal of the admissions." *Estate of Jones v. City of Martinsburg*, 655 F. App'x 948, 949 (4th Cir. 2016).

On remand, the district court denied withdrawal of the admissions, and again granted summary judgment in favor of the defendants. The Estate appealed, and we held that the Estate could not withdraw the admissions because it waived that right by failing to file a timely objection. *Estate of Jones*, 726 F. App'x at 177. Thus, the Estate is deemed to have admitted the following:

> (1) Wayne A. Jones advised an officer that he had 'something' when the officer asked [him] if he had a weapon;
> (2) Wayne A. Jones failed to comply with commands of officers to stop resisting;
> (3) Wayne A. Jones was carrying a knife on his person;
> (4) officers gave verbal commands for Wayne A. Jones to drop his knife before they fired their weapons;
> (5) Wayne A. Jones refused to drop his knife; and
> (6) Wayne A. Jones stabbed an officer with his knife, prior to any officer firing their service guns.

*Id*. at 176 (internal quotation marks omitted).

7

Despite these detrimental admissions, we reversed the district court's grant of summary judgment on the excessive force claims. We explained that the district court had improperly considered the facts in the light most favorable to the officers, rather than the Estate; ignored "discrepancies among the officers' accounts"; and assumed that Jones presented an ongoing threat as he lay on the ground because he still had the knife. *Id.* at 179. We concluded that a reasonable jury could find excessive force, because "it is not clear that Jones continued to pose an immediate threat of physical harm to the officers at the time they shot and killed him." *Id.* We also identified two pieces of evidence corroborating that Jones was not wielding a knife when he was shot. First, he was laying on his right side and the knife was in his right hand. Second, "at least one police officer" said that Jones "'did not make any overt acts with the knife towards the officers' once they stepped back." *Id.*

Upon remand, the defendants asked the court to consider whether the officers were shielded by qualified immunity, and whether the City could be liable under *Monell*. For the third time, the district court granted the defendants' motion for summary judgment, holding that qualified immunity applied because Jones was not "secured" under clearly established law, and holding that no *Monell* liability lay for a single incident. J.A. 578, 582. The district court dismissed the case with prejudice, and the Estate timely appealed.

## II.

For the first time, we consider whether the five officers who shot and killed Jones as he lay on the ground are protected by qualified immunity. We review the district court's

8

grant of summary judgment de novo. *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 537 (4th Cir. 2017). Awarding the officers summary judgment on qualified immunity grounds is only appropriate if they demonstrate "that there is no genuine dispute as to any material fact and [that they are] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We view the evidence in the light most favorable to the Estate and draw any reasonable inferences in its favor. *See id.*; *see also Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc).

Qualified immunity shields police officers who commit constitutional violations from liability when, based on "clearly established law," they "could reasonably believe that their actions were lawful." *See Booker*, 855 F.3d at 537–38; *see also Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992) ("Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines."). To determine whether qualified immunity applies, we conduct a two-step inquiry, in either order: (1) whether a constitutional violation occurred; and (2) whether the right was clearly established at the time of the violation (here, on March 13, 2013). *See Booker*, 855 F.3d at 538. Because this appeal arises from a summary judgment, and because we previously held that a jury could find that the officers violated Jones's Fourth Amendment right to be free from excessive force, *Estate of Jones*, 726 F. App'x at 179, this appeal turns on whether Jones's right was clearly established.[1]

---

[1] The defendants contend that we already answered this question in our 2016 opinion, in which we noted that the discovery admissions "constructively resolved all of the material issues in dispute, giving the motion a dispositive effect." *See Estate of Jones*, (Continued)

9

To determine whether this right was clearly established, we must first define the right at the "appropriate level of specificity." *See Booker*, 855 F.3d at 539 (citation omitted). Although *Tennessee v. Garner*, 471 U.S. 1 (1985), and *Graham v. Connor*, 490 U.S. 386 (1989), guide our analysis of whether deadly force is unconstitutionally excessive, those cases define the right generally and "do not by themselves create clearly established law outside 'an obvious case.'" *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (citation omitted); *see also Graham*, 490 U.S. at 396 (holding that among the factors to be considered under the Fourth Amendment's "objective reasonableness" standard are "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight"). In the context of an ongoing police encounter such as this one, we "focus on the moment that the force is employed." *See Henry*, 652 F.3d at 531.

Here, there are two distinct facts that separately define Jones's right to be free from excessive force at an appropriate level of specificity: (1) Jones, although armed, had been secured by the officers immediately before he was released and shot; and (2) Jones, although armed, was incapacitated at the time he was shot. Because it was clearly established that officers may not shoot a secured or incapacitated person, the officers are

---

655 F. App'x at 949. However, at that time, we did not independently consider the merits; we were explaining that the *district court* deemed those admissions to be dispositive, and yet that court did not consider the discretionary factors in Rule 36(b) in its discovery ruling. When we reached the merits of the excessive force claim in our 2018 opinion, we held that the admissions were not dispositive. *See Estate of Jones*, 726 F. App'x at 179. Our holdings are consistent and are not a result of any ambiguity in relevant Fourth Amendment law, as the defendants suggest.

10

not entitled to qualified immunity.

A.

First, the officers are not protected by qualified immunity because, viewing the evidence in the light most favorable to the Estate, Jones was secured before he was shot. A reasonable jury viewing the videos could find that Jones was secured when he was pinned to the ground by five officers. The defendants emphasize that Jones was not handcuffed, and that, as admitted, he stabbed an officer. Yet in 2013, it was already clearly established that suspects can be secured without handcuffs when they are pinned to the ground, and that such suspects cannot be subjected to further force. Indeed, as early as 1993, this Court held that a reasonable officer would know that once he had pinned a 100-pound woman to the ground, he should not further shove her into the pavement, cracking her teeth. *Kane v. Hargis*, 987 F.2d 1005, 1008 (4th Cir. 1993). Like Jones, Kane was not handcuffed. Just as one officer pinning a 100-pound suspect secured her, so too could five officers pinning 162-pound Jones secure him.

Moreover, before Jones's death,[2] this Court held that a police officer used excessive force when he continued to tase a domestic violence suspect after that suspect had dropped his weapon and fallen to the ground. *Meyers v. Baltimore Cty.*, 713 F.3d 723 (4th Cir. 2013). After three justified uses of a taser, the suspect dropped a baseball bat and fell. *Id.*

---

[2] The Estate's counsel apparently believed *Meyers* was decided after Jones's death. *See* Reply Br. 6. However, *Meyers* was decided on February 1, 2013; Jones was killed on March 13, 2013.

at 733. "Several officers" then "sat on [his] back, and [he] only was able to move his legs." *Id.* As in Jones's case, the participating officers in *Meyers* offered conflicting testimony as to whether the suspect was still actively resisting arrest, or whether his body had "stiffened" and "did not pose a continuing threat." *Id.* Ultimately, this Court held in *Meyers* that "[i]t is an excessive and unreasonable use of force for a police officer repeatedly to administer electrical shocks with a taser on an individual who no longer is armed, has been brought to the ground, has been restrained physically by several other officers, and no longer is actively resisting arrest." *Id.* at 734. The officer there was not protected by qualified immunity because he "us[ed] unnecessary, gratuitous, and disproportionate force to seize a *secured, unarmed citizen . . . .*" *Id.* at 735 (emphasis added) (quoting *Bailey v. Kennedy*, 349 F.3d 731, 744–45 (4th Cir. 2003)).

Concededly, as deemed admitted and unlike the suspects in *Meyers* and *Kane*, Jones was armed with a knife, which was tucked into his sleeve, and yet which he somehow used to stab an officer. Although problematic for the Estate, these admitted facts do not preclude a jury from finding that he was secured. It was already established that armed suspects can be secured even before an officer disarms them. *See Young v. Prince George's Cty.*, 355 F.3d 751, 757–58 (4th Cir. 2004) (holding that force used against a person already in handcuffs, who was cooperating during a traffic stop and informed the officer that he was armed, was excessive). Given the relatively inaccessible location of the knife, and the physical inability to wield it given his position on the ground, the number of officers on Jones, and Jones's physical state by this time, it would be particularly reasonable to find that Jones was secured while still armed.

12

The obvious retort is that a suspect who stabs an officer is not secured. But even given that admission, there remains a genuine question of fact as to whether Jones was secured at any point after Staub felt the knife, and before the officers simultaneously backed away. Staub called out multiple times that Jones had a knife, and another officer yelled to get back, all before the officers retreated.[3] To be sure, the incident moved quickly. But during all of this, Jones was still on the ground, with five officers on him. A jury could reasonably find that Jones was secured before the officers backed away, and that the officers could have disarmed Jones and handcuffed him, rather than simultaneously release him.

If Jones was secured, then police officers could not constitutionally release him, back away, and shoot him. To do so violated Jones's constitutional right to be free from deadly force under clearly established law.

B.

Second, and even were it to find that Jones was not secured, a jury could still reasonably find that he was incapacitated by the time of the shooting. Jones had been tased four times, hit in the brachial plexus, kicked, and placed in a choke hold, at which point gurgling can be heard in the video. A jury could reasonably infer that Jones was struggling to breathe. He lay on his side and stomach on the concrete with five officers on him. And

---

[3] Notably, Officer Staub did not say that he was stabbed, and it is unclear whether the other officers even knew that he was injured until after they shot Jones. Only Neely claims to have seen the stabbing.

13

when the officers got up and backed away, viewing the evidence in the light most favorable to the Estate, the officers saw his left arm fall limply to his body.

Unsurprisingly, it was clearly established in 2013 that officers may not use force against an incapacitated suspect. In 2011, this Court held in *Brockington v. Boykins* that "a reasonable officer would have recognized that deadly force was no longer needed after [a suspect] was injured and helpless with his back on the ground." 637 F.3d 503, 504–05 (4th Cir. 2011). After an officer shot a suspect and the suspect fell backwards, we concluded that the officer used excessive force by shooting that suspect six more times when he was "unable to get up or otherwise defend himself." *Id*. Even though the initial shooting was concededly justified, we agreed that it was excessive force to shoot the suspect "once he was already immobilized." *See id*. at 507. Like the suspect in *Brockington*, Jones appears helpless and immobilized at the time of his death.

Again, unlike Jones, the suspect in *Brockington* was unarmed. *Id*. But it was also clearly established at the time of Jones's death that simply being armed is insufficient to justify deadly force. *See Henry*, 652 F.3d at 534 (holding that shooting a "fleeing, nonthreatening misdemeanant" was unlawful, even when that suspect had a firearm); *see also Young*, 355 F.3d at 757 ("The fact that a suspect is armed, however, does not render all force used by an officer reasonable."). And, viewing the evidence in the light most favorable to the Estate, Jones was not even wielding the knife when the officers shot him; it was pinned under the right side of his body, which was on the ground, and tucked into his sleeve.

14

Finally, the officers contend that Jones should have dropped the knife upon their commands, and that his failure to do so places his shooting in the gray zone where qualified immunity applies.[4]  But again, the fact that he did not move or respond corroborates that he was incapacitated, and the reasonable officer would have recognized that fact.  Indeed, Lehman reported that Jones "did not make any overt acts with the knife towards the officers," and Staub reported that Jones "wasn't f\*\*king doing nothing."  And yet five officers wasted no time, giving Jones mere seconds to comply before firing.  The officers shouting "drop the knife" seconds before shooting him was, at best, farcical because it was impossible for an incapacitated person to drop a knife tucked into his sleeve.

By shooting an incapacitated, injured person who was not moving, and who was laying on his knife, the police officers crossed a "bright line" and can be held liable.  *See Wilson*, 893 F.3d at 222.  "Indeed, it is just common sense that [shooting] someone who is

---

[4] Because Jones did not drop the knife when so commanded, the defendants claim that his case is "materially indistinguishable" from *Wilson v. Prince George's County*, 893 F.3d 213 (4th Cir. 2018), and *Kisela v. Hughes*, 138 S. Ct. 1148 (2018), guaranteeing qualified immunity.  Resp. Br. 10.  In *Kisela*, a police officer shot a woman through the fence, when she had reportedly been acting erratically, refused to drop a knife, and was standing mere feet from another civilian.  *See* 138 S. Ct. at 1150–51.  The Ninth Circuit denied the officer qualified immunity, but the Supreme Court reversed.  *Id.* at 1151–54.  In sharp contrast, Jones lay on the ground, with a wall behind him.  Unlike *Kisela*, there is no evidence of any bystanders, whatsoever.  And viewing the evidence in the light most favorable to the Estate, Jones was completely incapacitated.  In *Wilson*, this Court held that a police officer was protected by qualified immunity when he shot a man who had reportedly just assaulted his girlfriend, and who was walking and stumbling towards the officer with a knife, stabbing himself and slitting his own throat.  893 F.3d at 216–17.  Again, unlike the man in *Wilson*, Jones was laying on the ground, atop his knife.  These cases do not remotely suggest that the police shooting at issue here falls in a similar gray zone.

15

already incapacitated is not justified under these circumstances." *Brockington*, 637 F.3d at 508.

*     *     *

Having zoomed in on the precise moments before Jones's death, we pull back for context. The defendants portray Jones as a fleeing, armed suspect, who was not cooperating with law enforcement and had even reportedly "hit" an officer, displacing that officer's hat. Non-cooperation with law enforcement has never given officers carte blanche to use deadly force against a suspect; luckily for many of us, neither has being "armed" with a small knife. Jones was not an armed felon on the run, nor a fleeing suspect luring officers into a high-speed car chase. Jones was walking in the road next to the sidewalk, away from the dark shadows and blind corners of buildings at night. He was without housing and had a knife on his person. As a pedestrian, he should have been on the sidewalk, but Officer Lehman never told him that.

Instead, Officer Lehman quickly escalated the encounter. Lehman asked for identification, which Jones did not have. He asked if Jones had a weapon, to which Jones responded by asking what a weapon is. There are myriad reasons why he may have asked that, including that he simply did not know whether a knife would count. Perhaps Lehman might have suspected mental health challenges; recall that Jones was diagnosed with schizophrenia. In any event, when told that "weapon" includes a knife, Jones admitted he had "something." Rather than follow the officer's command to put his hands on the vehicle, Jones continued to ask what he had done wrong. So Lehman tased him.

Jones took off on foot, but quickly cornered himself in a bookstore stoop. What we

16

see is a scared man who is confused about what he did wrong, and an officer that does nothing to alleviate that man's fears. *That* is the broader context in which five officers took Jones's life.

For the foregoing reasons, the district court erred by holding that the officers are protected by qualified immunity. In 2013, it was clearly established that law enforcement may not constitutionally use force against a secured, incapacitated person—let alone use deadly force against that person.[5]

III.

Turning to the Estate's *Monell* claim against the City of Martinsburg, we first consider how its claim is framed on appeal. The Estate's theory is that this single incident demonstrates the City's failure to adequately train police officers on the use of force. According to the Estate, Jones's shooting "reveal[s] a *desperate* need for more or different training," because the officers repeatedly ignored the "many options short of shooting and killing Jones." Opening Br. 24–25. Although the Estate mentioned two other instances of excessive force in its Complaint, it no longer relies on those incidents, and it does not

---

[5] Because a reasonable jury could find that Jones was secured, incapacitated, or both, we need not reach whether the officers' actions were so "flagrantly unlawful" as to refute any claim of qualified immunity. *See Browder v. City of Albuquerque*, 787 F.3d 1076, 1082–83 (10th Cir. 2015) (holding that "some things are so obviously unlawful that they don't require detailed explanation," and explaining that "it would be remarkable if the most obviously unconstitutional conduct should be the most immune from liability only because it is so flagrantly unlawful that few dare its attempt").

17

attempt to demonstrate a pattern of excessive force. The Estate has also abandoned any claim within the Complaint that the City's failure to train its officers on how to interact with people with mental illness gives rise to *Monell* liability.

For a municipality to be liable under § 1983 for failing to properly train police, the failure to train must "amount[] to deliberate indifference to the rights of persons with whom the police come into contact." *See City of Canton v. Harris*, 489 U.S. 378, 388 (1989). If the City's failure to train reflects such a deliberate or consciously indifferent "policy," then its failure can fairly be said to be the "moving force [behind] the constitutional violation." *See id.* at 389 (alteration in original) (quoting *Monell*, 436 U.S. at 694). Additionally, the training deficiency "must be closely related to the ultimate injury," meaning it must cause the incident. *Id.* at 391. Because *Monell* liability cannot be predicated on a theory of *respondeat superior¸* a single incident is almost never enough to warrant municipal liability. *See Semple v. City of Moundsville*, 195 F.3d 708, 713–14 (4th Cir. 1999) ("[P]roof of a single incident of the unconstitutional activity charged is not sufficient to prove the existence of a municipal custom.").

However, the Supreme Court has left open the possibility that "in light of the duties assigned to specific officers or employees the need for more or different training [may be] so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need"—the so-called *Canton* exception. *City of Canton*, 489 U.S. at 390; *see also Bd. of the Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 409 (1997) ("In *Canton*, we did not foreclose the possibility that evidence of a single violation of

federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability.").

At least as framed on appeal, Jones's death is an isolated incident of excessive force that cannot fall into the *Canton* exception, because Martinsburg *did* have an aggression policy, and the Estate has not shown how or why that policy is deficient—except by pointing to this single incident. MPD's aggression response policy was to "meet your aggression with the suspect's aggression," and required that incidents of physical force be necessary, objectively reasonable, and proportionate. J.A. 141–42. The Estate does not argue that the policy is facially unreasonable. Instead, it argues that this tragic incident makes obvious that the policy was not sufficiently implemented in training.

We take the Estate's point to be that five officers simultaneously violated this policy, and therefore the training must have been deficient. We agree that a reasonable jury could find that the officers' response violated the aggression policy. But *Monell*'s deliberate indifference standard ensures that a municipality either knew or should have known about the deficiency, so it could remedy that deficiency. At its core, the strict *Monell* test asks for some level of notice. And five officers acting at once could not have put the City on earlier notice of the need to better train its officers as to the existing use-of-force policy. Here, the City apparently understood that it needed a use-of-force policy to avoid the risk of likely constitutional violations, and it had one. The City cannot be liable under *Monell* because the Estate cannot prove that any deficiency in training "reflect[ed] a deliberate or conscious choice by a municipality . . . ." *Doe v. Broderick*, 225 F.3d 440,

19

456 (4th Cir. 2000).

Because we hold that the Estate has not shown deliberate indifference to the need for better or different training on the use of force, we do not reach whether any failure in training was the moving force behind the constitutional violation. As it is framed by the Estate, the *Monell* claim cannot succeed, and the district court properly granted summary judgment to the City. We thus affirm the district court's dismissal as to the *Monell* claim only.

IV.

Wayne Jones was killed just over one year before the Ferguson, Missouri shooting of Michael Brown would once again draw national scrutiny to police shootings of black people in the United States. Seven years later, we are asked to decide whether it was clearly established that five officers could not shoot a man 22 times as he lay motionless on the ground. Although we recognize that our police officers are often asked to make split-second decisions, we expect them to do so with respect for the dignity and worth of black lives. Before the ink dried on this opinion, the FBI opened an investigation into yet another death of a black man at the hands of police, this time George Floyd in Minneapolis. This has to stop. To award qualified immunity at the summary judgment stage in this case would signal absolute immunity for fear-based use of deadly force, which we cannot accept. The district court's grant of summary judgment on qualified immunity grounds is reversed, and the dismissal of that claim is hereby vacated.

20

*AFFIRMED IN PART, VACATED IN PART, AND REMANDED*