**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JON HYDE; MICHELLE HYDE,
              *Plaintiffs-Appellees*,

v.

CITY OF WILCOX; COCHISE COUNTY;
RAYMOND ROBINSON; BRIAN
PRALGO, Badge #6339, Individually;
S. BOHLENDER, Badge #1757,
Individually; S. GIJANTO; D.
NOLAND; JORDAN FAULKNER; M.
CALLAHAN-ENGLISH; J. VALLE,
AKA J. Villa, (#152), Individually;
DALE HADFIELD, Individually and as
the Director of Public Safety for the
City of Wilcox,
              *Defendants-Appellants*.

No. 21-15142

D.C. No.
4:20-cv-00100-
JGZ

OPINION

Appeal from the United States District Court
for the District of Arizona
Jennifer G. Zipps, District Judge, Presiding

Argued and Submitted December 8, 2021
Pasadena, California

Filed January 6, 2022

Before:  Carlos T. Bea and Kenneth K. Lee, Circuit Judges,
and Richard D. Bennett,* District Judge.

Opinion by Judge Lee

**SUMMARY**\**

**Civil Rights**

The panel affirmed in part and reversed in part the district court's denial of a motion to dismiss a complaint brought pursuant to 42 U.S.C. § 1983 alleging, among other things, that law enforcement officers used excessive force on pretrial detainee Luke Hyde when they applied physical force and a Taser to subdue him and failed to provide him with adequate medical care.

Hyde stopped breathing 21 minutes after being put in a restraint chair, and despite efforts by the officers to resuscitate him, he died five days later.  Hyde's parents sued on several theories under § 1983, including excessive force, failure to train, failure to supervise, failure to provide adequate medical care, and municipal liability.  The district court held that the officers used unreasonable force and were not entitled to qualified immunity.

---

\* The Honorable Richard D. Bennett, United States District Judge for the District of Maryland, sitting by designation.

\** This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

The panel affirmed the district court's denial of the motion to dismiss for the excessive force claim against officers Pralgo and Callahan-English. The panel held that the two officers used excessive force and violated clearly established law when they used a Taser and put Hyde in a head restraint, even after Hyde—who had his hands handcuffed and legs shackled—had apparently stopped resisting and posed no threat.

The panel reversed the denial of the motion to dismiss for the excessive force claim as to the other officer defendants, determining that they had reasonably used force earlier in the altercation when Hyde resisted prior to being subdued and restrained. The panel also reversed the district court's denial of dismissal on the claim that Hyde was denied adequate medical care. The panel determined that the complaint had not adequately alleged that the named officers knew of Hyde's mental health condition or that he was in distress after the altercation. The panel therefore held that qualified immunity barred the claim that individual officers violated Hyde's right to adequate medical care.

Finally, reviewing under pendent jurisdiction the district court's denial of the motion to dismiss the claims against the municipal defendants, the panel reversed on the failure-to-train and municipal liability claims. The panel stated that while deliberate indifference can be inferred from a single incident when "the unconstitutional consequences of failing to train" are "patently obvious," an inadequate training policy itself cannot be inferred from a single incident.

**COUNSEL**

James M. Jellison (argued), Jellison Law Offices, PLLC, Carefree, Arizona, for Defendants-Appellants.

Amy D. Sells (argued), William M. Fischbach, and Ryan P. Hogan, Tiffany & Bosco, P.A., Phoenix, Arizona, for Plaintiffs-Appellees.

**OPINION**

LEE, Circuit Judge:

Luke Ian Hyde's late-night return home from a road trip was cut short by a traffic stop and then ended tragically in a detention facility. Suffering from mental health issues and deprived of his medication for several hours, Hyde tried to flee and scuffled with several prison officers, who used physical force and a Taser to subdue him. He stopped breathing 21 minutes after being put in a restraint chair, and despite efforts by the officers to resuscitate him, he died five days later.

Hyde's parents sued on several theories under 42 U.S.C. § 1983, including excessive force, failure to train, failure to supervise, failure to provide adequate medical care, and municipal liability. The district court held that the officers used unreasonable force and were not entitled to qualified immunity. We affirm that two officers used excessive force and violated clearly established law when they used a Taser and put Hyde in a head restraint, even after Hyde—who had his hands handcuffed and legs shackled—had apparently stopped resisting and posed no threat. But we reverse for the other officers who reasonably used force earlier in the

altercation when Hyde resisted. We also reverse the district court's ruling on Hyde's right to medical care because the complaint has not adequately alleged that the named officers knew of his mental health condition. Finally, we reverse on the failure-to-train and municipal liability claims.

## BACKGROUND

### I.  Factual Background

Luke Ian Hyde—a 26-year-old man with mental health issues, including bipolar disorder, schizophrenia, and attention deficit hyperactivity disorder—managed his condition through six prescription medications.[1] One night, Hyde was driving through the City of Willcox towards his parents' home in San Antonio. Around midnight, Willcox police detective J. Valle pulled Hyde over and arrested him on suspicion of driving under the influence. Hyde arrived in booking at around 1:30 a.m. and submitted to a blood draw. He tested negative for alcohol but positive for amphetamines, a finding consistent with his Adderall prescription for his diagnosed attention deficit hyperactivity disorder. For the next five and a half hours, Hyde napped, ate, talked to officers on duty, and requested a phone to contact a lawyer.

Hyde did not receive his prescribed medication, and by 7:30 a.m., he appeared restless. Minutes later, he charged toward the door, fell to the floor, and injured his head. Deputy Raymond Robinson and Sergeant Brian Pralgo opened Hyde's cell, while Jordan Faulkner, a medic, waited

---

[1] The facts recited are taken as alleged in the complaint, and we accept them as true for this appeal. *See Padilla v. Yoo*, 678 F.3d 748, 757 (9th Cir. 2012).

in the booking area to examine Hyde's head wound. Hyde first emerged from his cell calmly, but then sprinted through the booking area and into the female cell area while Robinson, Pralgo, and Detention Officer Sam Bohlender unsuccessfully tried to tackle him. Hyde reached a dead end in the female cell area, where he stood with his back against the wall, facing Robinson, Pralgo, and Bohlender. At this point, Pralgo, and Robinson deployed their Tasers at Hyde in a fast sequence three times.

In the doorway of the booking area, a scuffle ensued: Pralgo, Robinson, and Bohlender heaped onto Hyde, and tried to handcuff him to the door handle. Lieutenant Sean Gijanto and Sergeant D. Noland then entered the fray. With Hyde lying on the ground, Robinson delivered 11 close-fisted peroneal strikes to Hyde's legs while other officers fastened leg irons on him. Pralgo again used his Taser twice at Hyde's thigh for about five seconds each.

At 8:02 a.m., Hyde was dragged to his feet and collapsed to his knees as at least six officers lifted his body and handcuffed Hyde's hands behind his back. At 8:03 a.m., Pralgo retrieved the restraint chair, and four officers hoisted Hyde's body into it with his hands cuffed behind his back and his legs fastened in leg irons. At 8:05 a.m., Pralgo again used his Taser on Hyde's thigh for about five seconds, while Callahan-English used her arms to force Hyde's head into a restraint hold as four officers fastened Hyde into the chair. Hyde was "fully restrained" in the chair at 8:06 a.m.

At 8:24 a.m., Hyde rolled his head back, gasping for air, as four officers passed by him. Three minutes later, he stopped breathing. A minute later, Pralgo, Valle, and Faulkner found Hyde pulseless. They immediately removed Hyde from the chair tried to revive him through chest compressions and defibrillator shocks for the next ten

minutes. At the hospital, he regained his pulse but was later put on life support. Several days later, Hyde's parents requested that he be removed from life support; he died the next day, about a week after his arrest. According to the autopsy, Hyde's causes of death included blunt force injuries, rhabdomyolysis (kidney damage caused by muscle breakdown), cardiomegaly (enlarged heart), and coronary artery atherosclerosis.

## II.  Procedural History

Hyde's parents brought this Section 1983 action against (i) the officers in their individual capacity for the use of excessive force, (ii) the City and the County for their failure to train, (iii) the Cochise County Sheriff Dannels and Willcox Director of Public Safety Hadfield for their supervisory liability for failure to train, and (iv) all defendants for violating Substantive Due Process and Equal Protection.

The defendants moved to dismiss the complaint, arguing, among other things, that the individual defendants are entitled to qualified immunity, and that Plaintiffs have failed plausibly to plead a claim for municipal liability under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). The district court denied the motion. The defendants appeal the denial of qualified immunity and ask us to exercise pendant appellate jurisdiction to review the *Monell* claim.

### JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction under 28 U.S.C. § 1291 to review interlocutory appeals of the denial of qualified immunity. *See Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). And as explained in more detail below, we have pendent appellate jurisdiction to review the claim against the municipal

defendants because "resolution of the issue properly raised on interlocutory appeal necessarily resolves the pendent issue." *Cunningham v. Gates*, 229 F.3d 1271, 1285 (9th Cir. 2000).

We review de novo a denial of a motion to dismiss based on qualified immunity, accepting as true all well-pleaded allegations of material fact and construing them in the light most favorable to the non-moving party. *See Padilla*, 678 F.3d at 757. Under Rule 12(b)(6), a complaint should be dismissed if it fails to include "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A complaint's claims are plausible when the pleaded facts "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## ANALYSIS

## I. The Complaint Plausibly Alleges That Two of the Officers Violated Hyde's Clearly Established Constitutional Rights.

To determine whether an officer enjoys qualified immunity, the court asks, in the order it chooses, (i) whether the alleged misconduct violated a constitutional right and (ii) whether the right was clearly established at the time of the alleged misconduct. *See Hernandez v. City of San Jose*, 897 F.3d 1125, 1132 (9th Cir. 2018). A clearly established right is one that is "sufficiently clear 'that every reasonable official would have understood that what he is doing violates that right.'" *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). "Plaintiffs must point to prior case law that articulates a constitutional rule specific enough to alert *these* deputies *in*

*this case* that *their particular conduct* was unlawful." *Sharp v. Cnty. of Orange*, 871 F.3d 901, 911 (9th Cir. 2017).

**A. The complaint plausibly alleges that Callahan-English and Pralgo used excessive force under clearly established law when they continued to use force after Hyde had been restrained and was not resisting.**

Use of force during pretrial detention is unconstitutionally excessive if it is "objectively unreasonable." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015). Objective reasonableness turns on the "facts and circumstances of each particular case." *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). "A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id.* (citing *Graham*, 490 U.S. at 396). Thus, a court must consider the "'legitimate interests that stem from the government's need to manage the facility in which the individual is detained,' appropriately deferring to 'policies and practices that in the judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security.'" *Id.* (quoting *Bell v. Wolfish*, 441 U.S. 520, 540, 547 (1979)).

The following considerations may bear on the reasonableness (or unreasonableness) of the force used: "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Id.* The most important factor is whether the suspect posed an immediate threat. *See Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc).

This analysis is not static, and the reasonableness of force may change as the circumstances evolve. *See Jones v. Las Vegas Metro. Police Dep't*, 873 F.3d 1123, 1130 (9th Cir. 2017).

   1. *Until Hyde was subdued and restrained, the force used by officers Pralgo, Robinson, Bohlender, Gijanto, and Noland was reasonable.*

At the outset, the officers handled the situation reasonably. After Hyde first violently injured himself in his cell, he ran free through the booking area of the detention center, despite three officers trying to contain him. Given the need to quell a potentially dangerous situation, Pralgo and Robinson justifiably used their Tasers against Hyde. *See Kingsley*, 576 U.S. at 399 (emphasizing the government's legitimate interest in managing a jail); *see also Jones*, 873 F.3d at 1130 (concluding that it was reasonable to use a Taser to subdue and restrain a suspect who was unarmed and not suspected of a serious offense).

As more officers joined the fray, they justifiably continued using intermediate force—the Taser and strikes on Hyde's leg—because (i) Hyde violently scuffled with the officers, (ii) the officers had not yet restrained Hyde, and (iii) the officers were "forced to make split-second judgments—in circumstances that [were] tense, uncertain, and rapidly evolving." *Graham*, 490 U.S. at 397.

Plaintiffs rely on *Deorle v. Rutherford*, 272 F.3d 1272 (9th Cir. 2001), to argue that we must consider Hyde's mental health issues in assessing the officers' use of force. In *Deorle*, we concluded that "where it is or should be apparent to the officers that the individual involved is emotionally disturbed, that is a factor that must be considered in determining . . . the reasonableness of the

force employed." *Id.* at 1283. But the complaint here does not allege that these officers knew about Hyde's mental health condition. Instead, the complaint asserts that a cursory inspection of Hyde's medication would have alerted any trained officer to his conditions, but it fails plausibly to allege that any of the named defendants even knew Hyde was taking medications. And unlike the plaintiff in *Deorle*—who appeared to be a "deeply troubled, emotionally disturbed individual . . . [who] repeatedly asked officers to shoot him," *id.* at 1280—there are no allegations here that Hyde exhibited any similar behavior. To the contrary, the complaint reflects that Hyde remained calm and cooperative for several hours.

### 2. After Hyde was subdued and restrained, officers Pralgo and Callahan-English used excessive force.

But the need for more force waned as circumstances changed. By 8:03 a.m., Hyde had his hands handcuffed behind his back and his legs shackled. Hyde appeared "fatigued," remained on his knees, and seven officers surrounded him. Yet two minutes later, Pralgo used his Taser on Hyde's thigh again for about five seconds and Callahan-English used her arms to force Hyde's head into a restraint hold, while four other officers fastened Hyde into the restraint chair. This continued use of force by Pralgo and Callahan-English was unreasonable. *See Alexander v. City & Cnty. of S.F.*, 29 F.3d 1355, 1367 (9th Cir. 1994) ("[I]t is the need for force which is at the heart of the consideration of the *Graham* factors.").

By 8:03 a.m., it was no longer a frantic and fast-evolving situation requiring officers to make split-second decisions. *Two minutes* had elapsed between Hyde being handcuffed and shackled and Pralgo and Callahan-English using more intermediate force. For two minutes, Pralgo and Callahan-

English saw an exhausted Hyde on his knees with both his hands and feet restrained. They should have recognized that Hyde had effectively stopped resisting and posed no threat to the officers surrounding him. They thus had enough time to reassess their use of force and understand that they no longer needed to use a Taser or a head restraint.

The defendants argue that continued force was justified because, according to their interpretation of the complaint, Hyde is never plausibly alleged to have ceased fleeing, resisting, or fighting before being "fully" restrained 8:06 a.m. Admittedly, the complaint confusingly does not state what was occurring between 8:03 a.m. (when Hyde had his hands and legs restrained) and 8:06 a.m. (when Hyde was "fully restrained"). The parties also inexplicably did not include the jailhouse video in the record. But we must construe the complaint in favor of the non-moving party—Plaintiffs—at this stage. *See Padilla*, 678 F.3d at 757. And the complaint, when read as a whole and in Plaintiffs' favor, supports the claim that he was restrained, was not resisting, and posed no threat by 8:03 a.m.

To start, the complaint alleges that—several minutes before Pralgo's final Taser use and Callahan-English's head restraint—Hyde had his hands handcuffed and feet shackled, was too weak to stand, and was surrounded by seven officers. Construing these facts in Plaintiffs' favor, we conclude that Hyde was not fleeing and could no longer resist the officers. We also construe the statement that Hyde was not "fully" restrained until 8:06 a.m. to mean that Hyde had not been fastened into a restraint chair. And we have never required that a suspect's every inch be immobilized before he is considered restrained for a reasonable force analysis. To the contrary, our cases routinely call suspects "restrained" after they have been handcuffed, *e.g.*,

*Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1059 (9th Cir. 2003), or simply pinned down by officers, *e.g.*, *Tuuamalemalo v. Greene*, 946 F.3d 471, 477 (9th Cir. 2019).[2] We thus conclude that, viewing the complaint in the light most favorable to Hyde, Pralgo and Callahan-English used excessive force after Hyde was restrained and apparently no longer resisting.

### 3. Pralgo and Callahan-English violated clearly established law.

Our cases clearly establish that the use of intermediate force—such as a head restraint or Taser—on a restrained and non-resisting suspect is unreasonable. For example, we have held that "the use of a chokehold on a non-resisting, restrained person violates the Fourth Amendment's prohibition on the use of excessive force." *Tuuamalemalo*, 946 F.3d at 477. In *Tuuamalemalo*, we also relied on *Drummond* in which we held that officers used excessive force by "press[ing] their weight on [the suspect's] neck and torso as he lay handcuffed on the ground." 343 F.3d at 1056. It thus should have been clear to Callahan-English that the use of a head restraint on Hyde was unreasonable when he had both his hands and feet shackled for two minutes and no longer could resist.

Similarly, the Ninth Circuit has found the use of a Taser excessive if the suspect does not pose an immediate threat. For example, in *Mattos*, this court held that it was unreasonable to use a Taser on a suspect who committed a

---

[2] The defendants do not fare any better with their focus on the allegation in the complaint that "[a]t all times, [Hyde] was fending himself against three to seven officers." In context, the more natural and favorable interpretation of this phrase is that Hyde was outmatched by three to several officers throughout the encounter.

minor offense and did not present an immediate threat to the officers, even though she refused to exit the car. *See* 661 F.3d at 445–46;[3] *see also Bryan v. McPherson,* 630 F.3d 805, 826–30 (9th Cir. 2010) (use of a Taser unreasonable because suspect committed a minor traffic infraction and did not present an immediate threat). Pralgo thus should have been on notice that it was unreasonable to use the Taser on Hyde, who was similarly not suspected of a serious crime, no longer threatened the officers after being restrained for two minutes and was no longer capable of resisting in the final stages of the scuffle.

Our cases also make it clear that the officers must reassess use of force in an evolving situation as the circumstances change. For example, in *Jones*, we concluded that the officers were at first justified in using a Taser on a suspect who had run away from a traffic stop but neither threatened the officers nor committed a serious offense. *See* 873 F.3d at 1130. But we held that "[b]y the time Jones was prone and surrounded by multiple officers, there would have been no continuing justification for using intermediate force." *Id.* Similarly, in *Drummond*, we said that while force was justified in restraining a suspect, the calculus changed "after he was handcuffed and lying on the ground." 343 F.3d at 1059.

To be clear, we are generally loath to second-guess law enforcement officers' actions in a dangerous situation by analyzing each act without looking at the entire event and considering the officers' mindset amid the uncertainty and chaos. We should not scrutinize an officer's every minor move in a frantic and chaotic situation as if we were

---

[3] These facts come from *Brooks v. City of Seattle* which was consolidated with *Mattos* for en banc proceedings.

examining the Zapruder film in slow-motion. But here, Pralgo and Callahan-English had two minutes to realize that Hyde—who was handcuffed, shackled, and exhausted—could no longer resist and did not pose a threat. It is clearly established that officers cannot use intermediate force when a suspect is restrained, has stopped resisting, and does not pose a threat. These two officers thus cannot shield themselves by invoking qualified immunity. We affirm this aspect of the district court's ruling.

**B. The complaint does not plausibly allege that the officers violated Hyde's right to adequate medical care under clearly established law.**

Under the Due Process Clause of the Fourteenth Amendment, pretrial detainees have a right to receive medical treatment while in police custody. *See Carnell v. Grimm*, 74 F.3d 977, 979 (9th Cir. 1996). A claim under this right "must be evaluated under an objective deliberate indifference standard." *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1124-25 (9th Cir. 2018) (citing *Castro v. Cnty. of L.A.*, 833 F.3d 1060, 1070 (9th Cir. 2016)). We have held that, as of 2013, "medical personnel at jail facilities are required to screen pretrial detainees for critical medical needs." *Gordon v. Cnty. of Orange*, 6 F.4th 961, 971 (9th Cir. 2021) ("*Gordon II*").

We have also long held that "prison officials violate the Constitution when they 'deny, delay or intentionally interfere with' needed medical treatment." *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 679 (9th Cir. 2021) (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)). That right, however, hinges on the officer being "aware that an inmate is suffering from a serious acute medical condition." *Id.* at 680. And it was not until earlier this year that we clearly established that "pre-trial detainees . . . have a right to direct-

view safety checks sufficient to determine whether their presentation indicates the need for medical treatment." *Gordon II*, 6 F.4th at 973.

Plaintiffs claim that the defendants violated Hyde's right to adequate medical care in two ways: (i) by denying him access to his medication, and (ii) by not providing him medical care after the altercation. Both arguments fail.

First, while Hyde had a clearly established right to obtain his medication, the complaint does not plausibly allege that *these* defendants violated that right. For example, the complaint fails to allege any facts that the individual defendants played any role in denying Hyde his medication and thus his right to medical treatment. The complaint thus makes no plausible connection between the confiscation of Hyde's medicines and any of the individual defendants. And while *someone* at the facility should have screened Hyde for his need for medication, the complaint does not allege any facts suggesting that the named individual defendants had that duty.

Second, the complaint also does not plausibly allege that the defendants denied him medical care after his melee with the officers. The right to medical care depends on an officer being "aware that an inmate is suffering from a serious acute medical condition." *Sandoval*, 985 F.3d at 680. The complaint alleges no facts suggesting that the defendant officers knew that Hyde was in distress. The complaint alleges that Hyde "rolled his head back against the headrest, gasping for air" as "four officers passed directly by" him. But the complaint does not specify whether these four officers were any of the ones named in the complaint. It also alleges that Callahan-English at one point walked directly past Hyde's breathless body. But there is no allegation that she noticed that Hyde was unconscious. And further

contradicting any claim of indifference to Hyde's medical needs, the complaint alleges that once Pralgo, Valle, and Faulkner discovered that Hyde was pulseless, they immediately tried to revive him. Finally, Plaintiffs' brief argues that the officers had a duty to check on Hyde's condition. But it was not clearly established until 2021 that a detainee has a right to regular direct-view safety checks. *See Gordon II*, 6 F.4th at 972.

In sum, because the complaint does not plausibly allege that any individual defendant violated Hyde's right to adequate medical care, we reverse the district court and hold that qualified immunity bars this claim.

### C. Dannels and Hadfield are entitled to qualified immunity on the supervisory liability for failure-to-train claim.

Under Section 1983, supervisors cannot be held liable for the acts of their reports under a *respondeat superior* theory. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). But supervisors "can be held liable for: 1) their own culpable action or inaction in the training, supervision, or control of subordinates; 2) their acquiescence in the constitutional deprivation of which a complaint is made; or 3) for conduct that showed a reckless or callous indifference to the rights of others." *Cunningham*, 229 F.3d at 1292.

To prevail on a claim of supervisory liability for failure to train, the plaintiff must show that the official was "deliberately indifferent to the need to train subordinates, and the lack of training actually caused the constitutional harm or deprivation of rights." *Flores v. Cnty. of L.A.*, 758 F.3d 1154, 1159 (9th Cir. 2014) (citing *Connick v. Thompson*, 563 U.S. 51, 59 (2011)). Under this standard, the plaintiff must allege facts to show that the official

"'disregarded [the] known or obvious consequence' . . . that a particular omission in their training program [would cause] [municipal] employees to violate citizens' constitutional rights." *Connick*, 563 U.S. at 61 (quoting *Bd. of the Cnty. Comm'rs v. Brown*, 520 U.S. 397, 407 (1997)).

Plaintiffs allege that Sheriff Dannels and Director of Public Safety Hadfield failed to train the officers in crisis intervention training that would have better prepared the officers to deal with detainees suffering from mental illness. They also allege that inadequate training led Hyde to be denied his medication.

But Plaintiffs offer no factual support for their allegations of defective training, and they argue in their brief that the claims are supported by the "events giving rise to the excessive force and inadequate medical care claims." The district court seemingly adopted this reasoning when it held that the complaint supports a plausible inference that neither the city nor the county properly trained its officers. The district court also held that the consequences of such a failure were known or obvious such that Plaintiffs did not have to identify a pattern of violations to support a plausible inference of deliberate indifference. In other words, the district court inferred from a single incident *both* that the training was defective *and* that the defendants were deliberately indifferent to its unconstitutional consequences.

We reject this attempt to circumvent the pleading requirement for a failure-to-train claim. While deliberate indifference can be inferred from a single incident when "the unconstitutional consequences of failing to train" are "patently obvious," *Connick*, 563 U.S. at 61, an inadequate training policy itself cannot be inferred from a single incident. *See Okla. City v. Tuttle*, 471 U.S. 808, 823–24

(1985) (plurality opinion);**[4]** *see also City of Canton v. Harris*, 489 U.S. 378, 391 (1989) (explaining that "adequately trained officers occasionally make mistakes; the fact that they do says little about the training program"). Otherwise, a plaintiff could effectively shoehorn any single incident with no other facts into a failure-to-train claim against the supervisors and the municipality. Because Plaintiffs pleaded no facts even suggesting that the training here was defective, they have failed to state a claim of failure to train against Dannels and Hadfield. We reverse the district court on this issue.

## II. We Have Jurisdiction to Hear the Appeal of the *Monell* Claim and Reverse the District Court's Denial of the Motion to Dismiss for Failure to State a Claim.

Besides the denial of a motion to dismiss based on qualified immunity, we "may [also] exercise 'pendent' appellate jurisdiction over an otherwise nonappealable ruling if the ruling is 'inextricably intertwined' with a claim properly before [the Court] on interlocutory appeal." *Kwai Fun Wong v. United States*, 373 F.3d 952, 960 (9th Cir. 2004) (citations omitted). This occurs when "(a) [the two issued are] so intertwined that we must decide the pendent issue in order to review the claims properly raised on interlocutory appeal, or (b) resolution of the issue properly raised on interlocutory appeal necessarily resolves the pendent issue." *Cunningham*, 229 F.3d at 1285.

---

**[4]** This was in the context of a *Monell* claim. The concurring opinion agreed with the plurality on this point: "To infer the existence of a city policy from the isolated misconduct of a single, low-level officer . . . would amount to permitting precisely the theory of strict *respondeat superior* liability rejected in *Monell*." *Tuttle*, 471 U.S. at 831 (Brennan, J., concurring).

That is the case here. As discussed, Dannels and Hadfield are entitled to qualified immunity because the complaint did not plausibly plead facts for supervisory liability. That conclusion applies equally to the City and the County because the complaint relies on the same facts. Thus, the failure to plausibly plead the existence of inadequate training sinks both claims equally.

## CONCLUSION

We **AFFIRM** the district court's denial of the motion to dismiss for the excessive force claim against officers Pralgo and Callahan-English, **REVERSE** the denial of dismissal for the remaining individual defendants for the excessive force claim and all individual defendants for to all other claims,[5] and **REVERSE** the denial of dismissal for the failure-to-train claim against the municipal defendants.

---

[5] Plaintiffs make no effort to defend their substantive due process and equal protection claims. We thus consider them abandoned. *See Cachil Dehe Band of Wintun Indians v. California*, 547 F.3d 962, 968 n.3 (9th Cir. 2008).