**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

DANIEL TURNER,

        Plaintiff-Appellee,

  v.

STEPHANIE JOHNIGAN, Officer,

        Defendant-Appellant,

 and

CITY OF LOS ANGELES; et al.,

        Defendants.

No. 20-55835

D.C. No.
2:18-cv-03405-DDP-KS

MEMORANDUM[*]

Appeal from the United States District Court
for the Central District of California
Dean D. Pregerson, District Judge, Presiding

Argued and Submitted October 7, 2021
Pasadena, California

---

      [*]    This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

Before:  GRABER and CHRISTEN, Circuit Judges, and ZOUHARY,[**] District Judge.

Concurrence by Judge CHRISTEN; Partial Concurrence by Judge ZOUHARY.

Officer Stephanie Johnigan appeals the district court's order denying her motion for summary judgment seeking qualified immunity.[1]  We have jurisdiction pursuant to 28 U.S.C. § 1291, and we reverse the district court's order.  Johnigan also requests that we exercise supplemental jurisdiction and dismiss Turner's state-law battery claim.  We decline to do so.

1.      We review de novo a district court's order denying summary judgment on the basis of qualified immunity, *Roybal v. Toppenish Sch. Dist.*, 871 F.3d 927, 931 (9th Cir. 2017), viewing the facts and drawing reasonable inferences in the light most favorable to Turner, *see Scott v. Harris*, 550 U.S. 372, 378 (2007).

To determine whether Johnigan is entitled to qualified immunity, we ask whether: (1) she violated a constitutional right; and (2) the constitutional right was clearly established.  *See C.B. v. City of Sonora*, 769 F.3d 1005, 1022 (9th Cir. 2014) (en banc).  Johnigan is entitled to qualified immunity if Turner's showing on

---

[**]      The Honorable Jack Zouhary, United States District Judge for the Northern District of Ohio, sitting by designation.

[1]      Because the parties are familiar with the facts, we recite only those facts necessary to decide this appeal.

either prong fails. *See Shafer v. County of Santa Barbara*, 868 F.3d 1110, 1115 (9th Cir. 2017).

A constitutional right is clearly established for purposes of qualified immunity if the right's contours were "sufficiently clear" so that "a reasonable official would understand that what [she did] violate[d] that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Turner primarily relies on two cases the district court discussed in its order denying Johnigan's request for qualified immunity: *Mattos v. Agarano*, 661 F.3d 433 (9th Cir. 2011) (en banc) [hereinafter *Mattos II*], and *Meyers v. Baltimore County*, 713 F.3d 723 (4th Cir. 2013).

In *Mattos II*, our en banc court reviewed two cases: *Brooks v. City of Seattle*, 599 F.3d 1018 (9th Cir. 2010), and *Mattos v. Agarano*, 590 F.3d 1082 (9th Cir. 2010). Brooks was pregnant when she was pulled over for speeding while driving her son to school. *Mattos II*, 661 F.3d at 436. Brooks refused the officers' direction to get out of the car, they tried to physically remove her from her car, and she clutched the steering wheel to frustrate their efforts. *Id.* at 437. One of the officers tased Brooks in drivestun mode three times in less than a minute, and we held that the officer's use of force was excessive. *Id.* at 446.

Mattos was standing in front of her husband when officers decided to arrest him in relation to a reported domestic dispute. *See id.* at 438–39, 449. Mattos's

only physical contact with the officer resulted from her "defensively raising her hands to prevent him from pressing his body against hers after he came into contact with her." *Id.* at 449. When Mattos asked why her husband was being arrested, the officer tased her in dart mode without warning. *Id.* at 439.

Our en banc court held that reasonable fact finders could conclude the officers used excessive force against both Brooks and Mattos because: (1) neither Brooks nor Mattos committed a serious crime or posed a threat to the officers; and (2) Brook's resistance was minor and Mattos did not resist arrest. *Id.* at 445–46, 451. But our en banc court ultimately granted the officers qualified immunity because no clearly established law made sufficiently clear that they violated a constitutional right. *Id.* at 448, 452.

In *Meyers*, the Fourth Circuit considered an excessive force claim similar to the claims in *Mattos II*. The officers in *Meyers* responded to a domestic dispute and tried to convince Meyers to exit the family residence and surrender. *Meyers v. Baltimore County*, 713 F.3d 723, 726–27 (4th Cir. 2013). Meyers refused. *Id.* at 727. The officers entered the residence and found Meyers holding a bat. *Id.* The officers tased Meyers several times, and he fell to the floor. *Id.* at 728. After he was down, three officers sat on his back, and a fourth officer tased Meyers seven more times. *Id.* The Fourth Circuit held that the last seven taser deployments were

excessive because Meyers was no longer armed and "ha[d] been brought to the ground, ha[d] been restrained physically by several other officers," and was no longer actively resisting arrest. *Id.* at 733–34.

Neither *Mattos* nor *Meyers* put Johnigan on notice that her taser use was excessive. Unlike both sets of circumstances presented in *Mattos II*, Turner: (1) was suspected of committing two serious felonies (attempted robbery and threatening to commit rape), *see* Cal. Penal Code § 1192.7(c)(1); (2) engaged in a scuffle with Officer Kong; and (3) continued to resist Kong and other officers, by holding a metal grate and pulling his arm away from them, until he was finally fully handcuffed. The facts in *Meyers* are closer to the circumstances presented by Turner's case, but *Meyers* is distinguishable because Turner had not submitted to being handcuffed when he was tased the final time.

Given this case law, Turner did not meet his burden of establishing that existing controlling precedent, or precedent embraced by a "consensus" of courts outside our circuit, squarely governed Johnigan's use of force. *See Martinez v. City of Clovis*, 943 F.3d 1260, 1275 (9th Cir. 2019). Nor is Johnigan's taser use so patently violative of constitutional rights that a reasonable officer would know without guidance from the courts that Johnigan's taser use was unconstitutional. *See, e.g.*, *Taylor v. Riojas*, 141 S. Ct. 52, 53–54 (2020) (per curiam); *Oliver v.*

*Fiorino*, 586 F.3d 898, 907–08 (11th Cir. 2009); *Deorle v. Rutherford*, 272 F.3d 1272, 1285–86 (9th Cir. 2001).

2.      Johnigan argues that we should exercise supplemental jurisdiction over Turner's state-law battery claim and dismiss it.  A court may exercise supplemental jurisdiction and "review an otherwise non-appealable ruling [only] when it is '"inextricably intertwined" with or "necessary to ensure meaningful review of" the order properly before [the court].'"  *Doe v. Regents of the Univ. of Cal.*, 891 F.3d 1147, 1154 (9th Cir. 2018) (quoting *Meredith v. Oregon*, 321 F.3d 807, 812–13 (9th Cir. 2003)).  Issues are inextricably intertwined if "resolution of the issue properly raised on interlocutory appeal necessarily resolves the pendent issue."  *Cunningham v. Gates*, 229 F.3d 1271, 1285 (9th Cir. 2000).  Qualified immunity is a federal doctrine that does not extend to California tort claims against government employees.  *See Cousins v. Lockyer*, 568 F.3d 1063, 1072 (9th Cir. 2009).  Thus, resolution of Johnigan's request for qualified immunity does not resolve Turner's state-law battery claim.  We therefore decline to reach that claim.

**REVERSED and REMANDED.**

*Turner v. Johnigan*, No. 20-55835
CHRISTEN, Circuit Judge, concurring in the judgment.

I concur in the court's memorandum disposition reversing the district court's order denying Officer Stephanie Johnigan qualified immunity. In my view this is a very close call, but I conclude that no clearly established law at the time of Turner's arrest would have provided adequate notice to a reasonable officer in Johnigan's position that her taser use was excessive. I write separately because relevant case law has developed since Turner's arrest and most cases involving qualified immunity are decided in memorandum dispositions that rely on a lack of clearly established law and thus provide little guidance to trial courts. Absent mention of case law issued after the events in Turner's case, our memorandum disposition might convey an inaccurate picture of the current state of the law on a fact pattern that frequently arises in excessive force cases.

I

Security guards told Officer Stephanie Johnigan and Officer David Kong that a "homeless-looking" white man in a black hoodie and khaki pants tried to rob and threatened to rape a female passerby earlier that morning. One of the guards showed the officers a photograph of the suspect. Johnigan and Kong then encountered Turner, who resembled the description and the photograph. Turner backed away when he saw the officers. Kong testified that he told Turner to "come

here," but Turner said "no" and began walking away.  Turner disputed that Kong said anything.

Kong grabbed Turner's hands and tried to handcuff him.  Turner resisted by bringing his hands in front of his body and pulling away.  Kong eventually tackled Turner and took him down to the pavement, where he put his weight on Turner to prevent him from moving.  Johnigan saw that Kong was "winded" and struggling, so she requested another unit to come to the scene.  At that point, Turner was prone and laying on top of a metal grate; Kong was on top of him and yelling for Turner to put his hands behind his back and stop resisting.  Turner responded, "No."

Kong warned Turner that if he refused to comply he would be tased, and Johnigan initially used her taser in dart mode at a distance of less than seven feet.  This first taser deployment lasted five seconds.  Johnigan testified that she did not see the darts contact Turner's skin but he yelled out "as if he was in pain."  Turner's left arm and wrist remained free and he held onto the metal grate.

A bodycam recording captured the final deployments of Johnigan's taser.[1]  It

---

[1]    The district court concluded that four of Johnigan's taser deployments were "clearly discernible" from the bodycam video.  The parties do not dispute this on appeal, but in the district court the parties agreed that "three to four" of Johnigan's taser deployments were captured on the video.  Whether the bodycam video captured the last three or the last four of Johnigan's taser deployments is debatable because the activations occurred in very quick succession.

shows Johnigan and Kong trying to pull Turner away from the grate with the help of a third officer who had arrived to assist, and a fourth officer trying unsuccessfully to remove Turner's grip on the grate. Beyond instructing Turner to let go of the grate, none of the officers spoke to Turner.

Turner continued to hold onto the grate and Johnigan tased him again. While four officers were holding down Turner's upper body and assisting with the handcuffs, two other officers "hobbled" Turner's legs with a strap. Eventually, the officers were able to free Turner's hand from the metal grate and handcuff him. After his left hand was freed but before the second handcuff was secured around his left wrist, Johnigan tased Turner an eleventh time. Turner cooperated after he was handcuffed and seated upright. Turner was taken to a local hospital, where he was treated for scrapes on his face and hands. He eventually pleaded no contest to making criminal threats, a felony, and resisting arrest, a misdemeanor.

Relevant here, the district court denied Johnigan's request for an order establishing that she was entitled to qualified immunity on Turner's § 1983 claim for excessive force. The court reasoned that it was sufficiently clear that tasing a suspect who was face down on the ground with three officers on top of him was an excessive use of force.

## II

To determine the reasonableness of an officer's conduct, courts consider: "(1) the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted, (2) the government's interest in the use of force, and (3) the balance between the gravity of the intrusion on the individual and the government's need for that intrusion." *Rice v. Morehouse*, 989 F.3d 1112, 1121 (9th Cir. 2021) (quoting *Lowry v. City of San Diego*, 858 F.3d 1248, 1256 (9th Cir. 2017) (en banc)); *see also Graham*, 490 U.S. at 396 (establishing the three-factor test); *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc) ("[T]here are no per se rules in the Fourth Amendment excessive force context; rather, courts 'must still slosh [their] way through the factbound morass of "reasonableness."'" (quoting *Scott v. Harris*, 550 U.S. 372, 383 (2007))).

Johnigan activated her taser eleven times for a total of fifty-three seconds over a period of about two minutes and eight seconds, and the record shows that Johnigan used dart mode at least once. From the bodycam video it appears that Johnigan used drivestun mode the last three or four times she activated her taser.[2]

---

[2] The bodycam video shows that the darts and wires were attached to Turner at least as of the time the officer with the bodycam arrived, which was after

(continued...)

4

Whether Johnigan deployed her taser in dart mode or drivestun mode for applications two through eleven, there is no question the taser inflicted a significant degree of pain. *See Bryan v. MacPherson*, 630 F.3d 805, 810–11 (9th Cir. 2010) (Wardlaw, J., concurring) (collecting cases describing the pain inflicted by a taser in dart mode); *Mattos*, 661 F.3d at 443, 449 (observing a woman tased in drivestun mode experienced significant pain); *Brown v. City of Golden Valley*, 574 F.3d 491, 495 (8th Cir. 2009) (describing drivestun mode as inflicting "extreme pain"). And the fact that Johnigan activated the taser eleven times in just over two minutes certainly evinces a very significant level of force. *See Mattos*, 661 F.3d at 445 (holding "rapid successi[ve]" tasings to be an "overwhelmingly salient factor" in holding that an officer's taser use was excessive).

To evaluate the government's interest in the use of force, courts consider: (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the officers or others; and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *See id.* at 443. The second factor is most important. *See Bryan*, 630 F.3d at 826 (quoting *Smith v. City*

---

[2](...continued)
Johnigan had fired the taser seven or eight times. Turner's complaint alleged that Johnigan tased Turner in dart mode the first two times and in drivestun mode the last nine times, but the parties disputed the modes of activation for the second through the eleventh applications of the taser.

5

*of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (en banc)). These factors are non-exhaustive, and courts consider the totality of the circumstances "including the availability of less intrusive alternatives to the force employed and whether proper warnings were given." *Rice v. Morehouse*, 989 F.3d 1112, 1121–22 (9th Cir. 2021).

Johnigan persuasively argues that the officers' use of *some* force was reasonable because Turner actively resisted. But the bodycam video shows that Turner's resistance had diminished considerably by the time the officer with the bodycam arrived. During that period, Turner's resistance consisted of holding the metal grate and trying to pull his left arm away from officers as they worked to close the second handcuff. *See Hyde v. City of Willcox*, 23 F.4th 863, 871 (9th Cir. 2022) (observing that the Ninth Circuit has "never required that a suspect's every inch be immobilized before he is considered restrained"); *Tuuamalemalo v. Greene*, 946 F.3d 471, 477 (9th Cir. 2019) (referring to a suspect as "restrained" when multiple officers had pinned him down and he was not resisting). In this case, it is not clear that Turner was fully restrained prior to the final taser deployment, nor that he had stopped resisting.

The first and third *Graham* factors indicate that the government had an elevated interest in subduing Turner because he was suspected of serious crimes,

he became embroiled in a scuffle that endangered Kong's safety, and he continued to resist arrest until the handcuffs were finally secured. But it is also clear that as the encounter wore on, Turner wound up prone, facedown, significantly outnumbered, and his resistance was limited to gripping the metal grate. By the time Johnigan tased Turner the final time, he was no longer holding the grate but he continued to resist the attempts to secure the second handcuff. Ninth Circuit case law makes clear that "officers must reassess use of force in an evolving situation as the circumstances change." *See Hyde*, 23 F.4th at 872; *Jones v. Las Vegas Metro. Police Dep't*, 873 F.3d 1123, 1130 (9th Cir. 2017) (observing that officers' use of force was initially appropriate but "[a]s the situation evolved . . . justification for the use of force waned"); *Bryan,* 630 F.3d at 825 (explaining that "all force . . . must be justified by the need for the specific level of force employed"). I agree with the district court that questions of fact prevented entry of summary judgment on the reasonableness of Johnigan's use of force because it is not clear whether Turner was fully restrained when Johnigan deployed her taser the final time.

B

Ninth Circuit case law relevant to this appeal has developed since Turner's arrest. First, *Jones v. Las Vegas Metro. Police Dep't* was published just a few

7

months after Turner was arrested. 873 F.3d 1123 (9th Cir. 2017). *Jones* arose from a vehicle stop for a minor traffic violation. *Id.* at 1127. Jones fled, and an officer used his taser to stop him. *Id.* The officer continued to hold the taser against Jones's thigh in drivestun mode while he waited for help. *Id.* Eventually, other officers responded and one of them also tased Jones, who was by then surrounded by four officers and laying prone on the ground. *Id.* With no video of the final minutes of the arrest and disputed facts concerning the extent of Jones's resistance, we held that questions of fact precluded summary judgment on the constitutional violation. *Id.* at 1132. We also held that any reasonable officer would have known by 2010 that the force used in *Jones* could only be justified if the suspect posed a risk of serious injury or death to the officers or the public. *Id.*; *see also Tennessee v. Garner*, 471 U.S. 1, 3 (1985).

*Jones* does not control the outcome in Turner's case for two reasons. First, the *Jones* opinion had yet to be issued when Turner was arrested so it could not have put Johnigan on notice of the prevailing clearly established law concerning the use of force. *See Kisela v. Hughes*, 138 S. Ct. 1148, 1154 (2018). Second, the misuse of the tasers in *Jones* was so extreme that it implicated the manufacturer's warnings concerning circumstances in which the use of tasers risks death or serious bodily injury, *Jones*, 873 F.3d at 1131; and in fact, Jones died at the scene of his

8

arrest,[3] *id.* at 1127.

In an even more recent case, we considered the use of a taser on a detainee who had been restrained and was no longer resisting. *See Hyde v. City of Willcox*, 23 F.4th 863, 873 (9th Cir. 2022). While in jail for suspicion of driving under the influence, Hyde sprinted through the booking area and several officers tased him, struck him with their fists, and put him in handcuffs and leg irons. *Id.* at 868. Though Hyde was exhausted, officers put him into a "restraint chair," where they tased him once more and forced his head into a restraint hold. *Id.* Soon after, Hyde stopped breathing and eventually died. *Id.* We held that the final taser deployment and use of a restraint hold on his head was excessive because Hyde "had effectively stopped resisting," he had been restrained, and he "posed no threat to the officers surrounding him." *Id.* at 871. *Hyde* relies on *Tuuamalemalo v. Greene*, 946 F.3d 471, 478 (9th Cir. 2019) (holding it was clearly established that a chokehold may not be used on a fully restrained, non-resisting individual), and *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1059 (9th Cir.

---

[3] A police-practices expert explained that the normal cycle for the taser was five seconds, but the evidence in *Jones* showed the taser "frequently went past the five-second application cycle—with some shocks lasting eleven seconds, thirteen seconds (twice) and nineteen seconds." *Id.* at 1131. The taser left "burn marks," *id.*, and a "coroner's report concluded that 'police restraining procedures'—including the tasings—contributed to Jones's death," *id.* at 1127.

2003) (squeezing the breath from a compliant, prone, and handcuffed individual constituted the use of excessive force).

Like *Jones*, *Hyde* does not control the outcome in this appeal because *Hyde* was decided after the events in Turner's case and thus could not have put Johnigan on notice of the prevailing clearly established law. *See Kisela*, 138 S. Ct. 1148, 1154 (2018). *Hyde* is also distinguishable because the detainee in that case had been restrained and was not resisting when he was tased the final time.

Turner did not meet his burden of establishing that existing controlling precedent, or precedent embraced by a "consensus" of courts outside our circuit, squarely governed Johnigan's use of force. *See Martinez v. City of Clovis*, 943 F.3d 1260, 1275 (9th Cir. 2019). I therefore concur in the court's conclusion that Johnigan is entitled to qualified immunity.

III

Our case law clearly establishes that: (1) even if the use of intermediate force is justified at the outset of an officer's encounter with a suspect, that level of force may become excessive as circumstances change, *Hyde*, 23 F.4th at 871; (2) officers may not tase an individual who is fully restrained and not resisting, *id.* at 872; and (3) a suspect need not be handcuffed to be fully restrained, *id.* at 871–72.

10

Turner v. Johnigan, No. 20-55835

Zouhary, J., concurring in part:

I agree with the decision to reverse the district court denial of qualified immunity based on the "clearly established" prong. However, I find that the force used in this case was excessive as a matter of law. I write separately to provide some context on the undisputed facts.

Johnigan's taser log reveals that she activated her taser 11 times (for a total of 53 seconds over a 2 minute 8 second period) during her encounter with Turner. The tasing occurred in 2 separate sequences or "bursts." Johnigan initially tased Turner 8 times, followed by a 27-second pause. She then tased him 3 more times. This second burst, which took place over a period of 35 seconds, was caught on a fellow officer's bodycam.

The bodycam video reveals several key points. At the time of the final taser sequence, Turner is pleading with officers for an explanation of what is happening to him. He repeatedly says, "I don't trust you," and asks officers, "Will nobody say something?" Turner then continues to plead with officers: "Promise you won't take me to jail." At no point do any of the officers respond to Turner's questions or pleas.

The video also shows that Turner was so outnumbered that he posed no threat during the final taser sequence. Turner was pinned facedown on the sidewalk by four officers, and two additional officers had hobbled his legs with a strap. A

handcuff had been secured to his right wrist, and officers were holding onto his left arm as they worked to free his left-hand grip on the metal grate. Turner never attempted to get up or otherwise reacted violently, and there were no bystanders in the area. He made no threats or threatening movements toward officers. There was also no suspicion that he was armed or in danger of being able to grab a weapon. In all, the video corroborates the LAPD's own internal investigation, which determined that Turner was not "violently resisting" and therefore Johnigan's taser usage was "out of policy."

Importantly, at no point during this encounter did Johnigan -- or any other officer -- attempt to verbally engage Turner in an effort to convince him to calm down and release his left hand from the grate. Instead of deescalating the situation, Johnigan continued tasing Turner, even after it was clear he was not a threat. *See Deorle v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir. 2001) (outlining that "[a] desire to resolve quickly a potentially dangerous situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury").

While true that *some* force here was reasonable, the force must be reasonable throughout the entire encounter. *See Hyde v. City of Willcox*, 23 F.4th 863, 870 (9th Cir. 2022) (holding that "the reasonableness of force may change as the circumstances evolve"). As additional officers arrived and Turner's ability to move decreased, the situation evolved -- the need for the use of force diminished. *See*

2

*Jones v. Las Vegas Metro. Police Dep't*, 873 F.3d 1123, 1130 (9th Cir. 2017) ("As the situation evolved, . . . the justification for the use of force waned.").

Exactly what took place during the initial taser burst may be in dispute. But the video evidence reveals that, at the time of Johnigan's second taser sequence, Turner's resistance had diminished considerably, and consisted only of holding onto the metal grate with his left hand. He was outnumbered, pinned facedown, and unable to move. By this point, Turner no longer posed a legitimate threat to the safety of officers or others, much less an "immediate threat." *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (en banc) (citation omitted). This Court has recognized that this is the most important factor in considering if force was constitutionally excessive. *Id.*

Because the video evidence resolves any material factual disputes, I find the force used during the final and separate taser sequence excessive as a matter of law.

3